**EASTERN KENTUCKY WELFARE RIGHTS ORGANIZATION et al.**

**v.**

**William E. SIMON, Secretary of the Treasury, et al., Appellants.**

**No. 74–1293.**

United States Court of Appeals, District of Columbia Circuit.

Argued June 12, 1974.

Decided Oct. 9, 1974.

Rehearing Denied Dec. 6, 1974.

———◆———

Wesley J. Filer, Atty., Tax Div., Dept. of Justice, of the bar of the Supreme Court of Texas, pro hac vice, by special leave of court, with whom Scott P. Crampton, Asst. Atty. Gen., Earl J. Silbert, U. S. Atty., and Meyer Rothwacks and Leonard J. Henzke, Jr., Attys. Tax Div., Dept. of Justice, were on the brief, for appellants.

Marilyn G. Rose, with whom Joseph Onek, Jeffrey B. Schwartz, Laurens H. Silver, and Anthony Z. Roisman, Washington, D. C., were on the brief, for appellees.

John A. Beck, Washington, D. C., filed a brief on behalf of American Hospital Association as amicus curiae urging reversal.

Before WRIGHT and WILKEY, Circuit Judges, and JAMESON,* Senior District Judge.

JAMESON, Senior District Judge:

Defendants-appellants, the Secretary of the Treasury and Commissioner of Internal Revenue, have appealed from an order granting summary judgment to plaintiffs-appellees and holding that "private nonprofit hospitals seeking tax exempt status as charitable organizations under § 501(c)(3) of the [Internal Revenue] Code must provide free or below cost treatment to individuals unable to pay for such services" and that a revenue ruling modifying this requirement is void.[1]

## I. BACKGROUND

Sections 501(a) and (c)(3) of the Internal Revenue Code of 1954 (26 U.S.C. 501(a) and (c)(3)) exempt from federal income tax: "(3) Corporations, and any community chest, fund, religious, or foundation, organized and operated exclusively for charitable . . . purposes, . . . no part of the net earnings of which inures to the benefit of any private shareholder or individual . . . ". Other related sections of the Code provide that contributions to such tax exempt charitable organizations are deductible for purposes of computing federal income tax (26 U.S.C. § 170) and estate and gift taxes (26 U.S.C. §§ 2055 (a)(2), 2106(a)(2)(A)(ii) and 2522(a) (2)).

Hospitals and other health organizations have never been expressly categorized as tax exempt organizations and have achieved that status only by qualifying as "charitable" organizations under the Code. Long established Internal Revenue Service (I.R.S.) policy held that hospitals qualified as charitable organizations under 501(c)(3) only if they provided free or below cost service to those unable to pay. This policy was articulated in Revenue Ruling 56–185, which held that a hospital could qualify for tax exempt status only if it was "operated to the extent of its financial ability for those not able to pay for the services rendered and not exclusively for those who are able and expected to pay".[2]

The I.R.S. modified this position in 1969 with the issuance of Revenue Ruling 69–545. The new ruling broadly defines "charitable" in terms of community benefit and holds that the promotion of health constitutes a "charitable purpose" in the "generally accepted legal

---

* Of the United States District Court for the District of Montana, sitting by designation pursuant to 28 U.S.C. § 294(d) (1970).

1. By order of this court, the American Hospital Association was granted leave to file briefs as amicus curiae.

2. Other pertinent parts of Revenue Ruling 56–185 state: "It is normal for hospitals to charge those able to pay for services ren-

dered in order to meet the operating expenses of the institution without denying medical care or treatment to others unable to pay. . . . It may furnish services at reduced rates which are below cost, and thereby render charity in that manner. . . . It must not, however, refuse to accept patients in need of hospital care who cannot pay for such services."

sense of that term"[3] and within the meaning of § 501(c)(3) of the Code. According to the ruling,

"The promotion of health . . . is one of the purposes in the general law of charity that is deemed beneficial to the community as a whole even though the class of beneficiaries eligible to receive a direct benefit from its activities does not include all members of the community, such as indigent members of the community . . . ".

Based on this community benefit concept, a nonprofit hospital can qualify as a charitable organization under § 501 (c)(3) "By operating an emergency room open to all persons and by providing hospital care for all those persons in the community able to pay the cost thereof either directly or through third party reimbursement . . . " [e. g. private health insurance, Medicare, or Medicaid]. Thus, for a hospital to qualify as a tax exempt organization, the provision of free or below cost service to those unable to pay is no longer essential.[4]

Alleging harm from this new ruling, the plaintiffs-appellees, a group of health and welfare organizations and indigent persons, brought this action seeking to declare Revenue Ruling 69–545 invalid and to enjoin its implementation. They submitted affidavits recounting incidents in various parts of the country involving the denial of hospital services to indigents by institutions enjoying tax exempt status as "charitable" organizations.

Plaintiffs contended that (1) the Revenue Ruling constitutes an improper administrative alteration of the Internal Revenue Code in contradiction of longstanding Congressional tax policy and judicial interpretation; (2) the Ruling was not properly adopted due to the I. R.S. failure to grant interested parties an opportunity to be heard, allegedly a violation of the Administrative Procedure Act and the Fifth Amendment right of due process; and (3) the Ruling was an "abuse of discretion".

The defendants moved for dismissal of plaintiffs' complaint on the ground that the court lacked jurisdiction to entertain the action. The court denied this motion without opinion. Subsequently, upon the parties' cross motions for summary judgment, the court granted summary judgment in favor of the plaintiffs.

The court held:

(1) The plaintiffs have standing to maintain this action because they "have demonstrated sufficient injury flowing from the issuance of Revenue Ruling 69–545" and fall within the zone of interests protected by the Code.[5]

(2) The Federal tax exemption to the Declaratory Judgment Act, 28 U.S.C. § 2201, and the Tax Injunction Act, 26 U.S.C. § 7421(a), do not bar the suit.

(3) Judicial review of the Revenue Ruling is not precluded by the Administrative Procedure Act's provision in 5 U.S.C. § 701(a)(2) which forbids review of "agency action . . . committed to the agency discretion by law".

(4) The new Revenue Ruling does not comport with Congressional intent but rather is clearly contrary to the relevant judicial, legislative and administrative history on the matter. In light of this,

3. As a basis for its conclusion that in the "general law of charity" the promotion of health is a charitable purpose, the I.R.S. relies on Restatement (Second) Trusts, secs. 368 and 372, and IV Scott on Trusts (3rd ed. 1967) secs. 368 and 372.

4. Revenue Ruling 69–545 expressly states: "Revenue Ruling 56–185 is hereby modified to remove therefrom the requirements relating to caring for patients without charge or at rates below cost".

5. The district court, with respect to standing, noted that generally an action challenging a ruling of the Internal Revenue Service is in the nature of a refund action. The ruling challenged in this instance, however, is not one that will produce protesting taxpayers. The court concluded that this should not "immunize the Ruling" from judicial scrutiny, especially where, as here, the plaintiffs belong to a class of people whom the relevant sections of the Code purport to benefit.

**1282**

the "community benefit" theory cannot "justify the basic shift in policy". The promulgation of the new ruling was therefore unauthorized.

### Contentions on Appeal

Appellants level a dual attack against the judgment. First, they contend that the district court lacked jurisdiction in that the action is barred by (a) sovereign immunity, (b) the Anti-Injunction Act and the tax exemption to the Declaratory Judgment Act, and (c) the Administrative Procedure Act.[6] Second, appellants argue that Revenue Ruling 69–545 was authorized and does meet the charitable standard of § 501(c)(3) of the Code. In addition to opposing the contentions of appellants, appellees argue that the Revenue Ruling was not promulgated in accordance with the notice and hearing requirement of the Administrative Procedure Act and constitutes an abuse of discretion.

### II. JURISDICTION

(a) *Sovereign Immunity*

 The defense of sovereign immunity is jurisdictional. *See* United States v. Sherwood, 312 U.S. 584, 61 S. Ct. 767, 85 L.Ed. 1058 (1941). Generally, without specific authority, a court may not entertain an action against the sovereign. That doctrine, however, is not without its exceptions. The two primary exceptions were delineated in Larson v. Domestic and Foreign Corp., 337 U.S. 682, 69 S.Ct. 1457, 93 L.Ed. 1628 (1949): sovereign immunity will not serve to bar jurisdiction when (1) the actions of a government official are beyond the scope of his authority or (2) "the statute or order conferring power upon the officer to take action in the

sovereign's name is claimed to be unconstitutional". *Id.* at 689–690, 69 S.Ct. at 1461; *accord* Dugan v. Rank, 372 U.S. 609, 621–622, 83 S.Ct. 999, 10 L.Ed.2d 15 (1963). Here plaintiffs alleged, and the district court found, that government officials had acted beyond their statutory power.

Appellants contend that (1) regardless of exceptions that may have been formulated in other judicial areas, sovereign immunity in matters of federal tax remains an absolute bar; (2) even if the *Larson* exceptions are viable in tax cases, the Commissioner was authorized by statute to interpret the term "charitable" as he did; and (3) mere error by the Commissioner in his interpretation of "charitable" would not negate the application of sovereign immunity, *Larson, supra,* 337 U.S. at 690, 69 S.Ct. 1457.

Appellants rely on Louisiana v. McAdoo, 234 U.S. 627, 34 S.Ct. 938, 58 L. Ed. 1506 (1914) in support of their contention that the defense of sovereign immunity is absolute with respect to the area of federal taxes. *McAdoo* involved an action against the Secretary of the Treasury brought by the State of Louisiana as a sugar producer. Louisiana challenged the Secretary's determination of the tariff rates to be applied to sugar imported from Cuba. The Court held that the defense of sovereign immunity barred the action regardless of the fact that the State of Louisiana claimed that the action of the Secretary was not authorized by law.

*McAdoo,* however, must be viewed in its proper perspective. The Court decided that case in 1914. Since then, significant changes have occurred in the area of standing, and exceptions to the doctrine of sovereign immunity have been

---

6. The American Hospital Association in its *amicus* brief and appellants in note 46 of their brief contend also that appellees do not have standing because they have failed to demonstrate injury by an agency to an interest protected by the Code. This issue was discussed at length in the opinion of the district court. We agree with the court's conclusion that appellees made a sufficient showing of "injury in fact" to an interest "arguably within the zone of interests to be protected or regulated". *See* Sierra Club v. Morton, 405 U.S. 727, 733, 92 S.Ct. 1361, 1365, 31 L.Ed.2d 636 (1972); United States v. Students Challenging Regulatory Agency Procedures, 412 U.S. 669, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973).

judicially recognized. *Larson* and *Dugan, supra.* Moreover, with the advent of the Administrative Procedure Act in 1946, the continued viability of sovereign immunity with respect to administrative actions has been seriously questioned. Scanwell Laboratories, Inc. v. Shaffer, 137 U.S.App.D.C. 371, 424 F.2d 859, 873 (1970).

The exceptions to the doctrine of sovereign immunity set forth in *Larson* have been applied in federal tax cases. In McGlotten v. Connally, 338 F.Supp. 448 (D.D.C.1972), a nontaxpayer challenged the exempt status of a fraternal organization with racially discriminatory membership policies. The three-judge court rejected a sovereign immunity argument, holding that the "action falls readily within the two longstanding exceptions to that doctrine". *Id.* at 454, n. 27.[7] This court recognized the application of those exceptions in Americans United v. Walters, 155 U.S.App.D.C. 284, 477 F.2d 1169 (1973), reversed on other grounds sub nom., Alexander v. Americans United, 416 U.S. 752, 94 S.Ct. 2053, 40 L.Ed.2d 518 (1974).[8]

■■ The Government is correct in contending that "a claim of error" in the exercise of an officer's powers is not sufficient to invoke the scope of authority exception to the sovereign immunity doctrine. *Larson, supra,* 337 U.S. at 690, 69 S.Ct. 1457. Plaintiffs in this case, while not challenging the fact that the Secretary or Commissioner has the authority to prescribe rules and regulations for the administration of the revenue laws, nevertheless do challenge the authority of the Commissioner to interpret a revenue statute in a manner contrary to long-established Congressional policy. Thus, more than mere error on the part of the Commissioner is alleged.

The court, therefore, has jurisdiction to determine whether or not the action of the Commissioner was authorized. The court has jurisdiction to determine its jurisdiction, Land v. Dollar, 330 U.S. 731, 739, 67 S.Ct. 1009, 91 L.Ed. 1209 (1947), even though such a determination requires a decision on the merits. *Larson, supra,* 337 U.S. at 690, 69 S.Ct. 1457; Bell v. Hood, 327 U.S. 678, 682–683, 66 S.Ct. 773, 90 L.Ed. 939 (1946); *Junior Chamber of Commerce, supra.*

■ That sovereign immunity does not serve as a bar to the present action is further established by this court's position that the Administrative Procedure Act constitutes a waiver of sovereign immunity. Quoting from Estrada v. Ahrens, 296 F.2d 690, 698 (5 Cir. 1961), this court in *Scanwell, supra,* 424 F.2d at 873 stated:

"By providing judicial review in an action brought by 'any person adversely affected or aggrieved by any agency action' Congress permitted suits which under established tests would certainly be barred as suits against the government. . . . The Act thereby makes a clear waiver of sovereign immunity in actions to which it applies."

■ We conclude that the district court correctly held that the action was not barred by the doctrine of sovereign immunity.

(b) *Anti-Injunction and Declaratory Judgment Acts*

The Anti-Injunction Act (26 U.S.C. § 7421(a)) provides in relevant part: " . . . no suit for the purpose of restraining the assessment or collection of any tax shall be maintained in any court by any person, whether or not such person is the person against whom such tax

---

7. The Government argues that *McGlotten* is either wrong or distinguishable in that it involved racial discrimination, a judicially sensitive issue. That the racial aspect was the controlling factor in the court's determination of *McGlotten* is not supported by the language of the decision.

8. See also Green v. Kennedy, 309 F.Supp. 1127 (D.D.C.1970), continued sub nom., Green v. Connally, 330 F.Supp. 1150 (D.D.C.1971), aff'd per curiam sub nom., Coit v. Green, 404 U.S. 997, 92 S.Ct. 564, 30 L.Ed. 2d 550 (1971); Junior Chamber of Commerce of Rochester, Inc. v. United States Jaycees, 495 F.2d 883 (10 Cir. 1974).

was assessed". In Bob Jones University v. Simon, 416 U.S. 725, 94 S.Ct. 2038, 2046, 40 L.Ed.2d 496 (1974), the Court stated:

"The Court has interpreted the principal purpose of this language to be the protection of the Government's need to assess and collect taxes as expeditiously as possible with a minimum of preenforcement judicial interference, 'and to require that the legal right to the disputed funds be determined in suit for a refund.' Enochs v. Williams Packing and Navigation Co., 370 U.S. 1, 7, 82 S.Ct. 1125, 1129, 8 L.Ed.2d 292 (1962)."

Here, the plaintiffs as nontaxpayers seek to have the I.R.S. enjoined from granting tax exempt status to hospitals which fail to provide free or reduced-charge services to indigents. The case of McGlotten v. Connally, *supra*, is analogous. In *McGlotten* a black American brought a class action "to enjoin the Secretary of Treasury from granting tax benefits to fraternal and nonprofit organizations which exclude nonwhites from membership". *Id.*, 338 F.Supp. at 450. In rejecting the contention that the Anti-Injunction Act barred the suit, the court concluded that the action had "nothing to do with the assessment or collection of taxes. He [the plaintiff] does not contest the amount of his own tax, nor does he seek to limit the amount of tax revenue collectible by the United States. The preferred course of raising his objections in a suit for refund is not available. In this situation we cannot read the statute to bar the present suit." *Id.* at 453–454.

The *McGlotten* rationale was followed by this court in Americans United v. Walters, 155 U.S.App.D.C. 284, 477 F.2d 1169 (1973) in holding that a corporation in challenging the revocation of its tax exempt status was not attempting to restrain the assessment or collection of taxes. The Supreme Court, however, in Alexander v. Americans United, Inc., 416 U.S. 752, 94 S.Ct. 2053, 40 L.Ed.2d 518 (1974) reversed. The Court held that the purpose of the suit was to restrain the collection of taxes from contributors to the corporation. Accordingly, the Anti-Injunction Act applied and barred the action. The Court further stressed that an adequate legal remedy existed in the form of refund litigation.

*Americans United*, however, did not involve the factual situation presented in *McGlotten* and in this action. Here, as in *McGlotten*, rather than attempting to negate the levy of a tax, the plaintiffs are seeking to force the Government to impose a tax on contributions to certain hospitals. This, therefore, is not a case wherein the Government is faced with any threat to the actual assessment or collection of the taxes to which it deems itself entitled.

■ In addition, there is merit in the claim that there is no other adequate legal remedy.[9] Obviously neither the tax exempt charitable hospitals nor their contributors will institute refund litigation, as the contributions are tax free. It is apparent from a close analysis of the Anti-Injunction Act that it did not contemplate barring actions, such as this, where the litigation did not threaten to deny anticipated tax revenues to the Government.

Appellants next contend that, even if the Anti-Injunction Act is held inapplicable, the tax exemption provision of the Declaratory Judgment Act (28 U.S.C. § 2201) bars the action. That provision authorizes federal courts to grant declaratory judgments "except with respect to Federal taxes". Appellants argue that the Declaratory Judgment Act is much broader in scope than the Anti-Injunction Act.

In *McGlotten, supra,* the court concluded that the Anti-Injunction Act and Declaratory Judgment Act are coterminous. This court in *Americans United,*

---

9. In *Bob Jones, supra,* 94 S.Ct. at 2050, the Court stated: "This is not a case in which an aggrieved party has no access at all to judicial review. Were that true, our conclusion might well be different."

*supra,* following the rationale *of Mc-Glotten,* held that while the tax exemption provision of the Declaratory Judgment Act is literally broader than the Anti-Injunction Act provision, nevertheless the two are coterminous. The court reasoned that it would be paradoxical to authorize injunctive relief in some cases "while depriving courts the authority to declare the rights of the parties in connection with the injunctive relief". *Id.,* 477 F.2d at 1176.

 Although the Supreme Court reversed *Americans United,* it did not deal with the issue of whether or not the Declaratory Judgment Act was broader than the Anti-Injunction Act.[10] A reexamination of the legislative history of the tax exemption provision leads this court to conclude, as it did in *Americans United,* that the Declaratory Judgment Act and the Anti-Injunction Act were intended to be coterminous.[11] Therefore, just as the Anti-Injunction Act does not bar this action, neither does the Declaratory Judgment Act.

### (c) *Administrative Procedure Act*

In contending that the Administrative Procedure Act precludes this action, appellants rely on 5 U.S.C. 701(a)(1), which indicates that administrative actions are not subject to review "to the extent that (1) statutes preclude judicial review". With respect to this exception, the Supreme Court has held that access to judicial review will generally not be denied unless there is a showing by "clear and convincing evidence" of a contrary legislative intent. Rusk v. Cort, 369 U.S. 367, 379–380, 82 S.Ct. 787, 7 L.Ed.2d 809 (1962). Appellants argue that the Anti-Injunction Act, the tax exception to the Declaratory Judgment Act and the doctrine of sovereign immunity, combined with specific procedures established by Congress for review of tax matters, all indicate Congressional intent to "preclude judicial review".

 We have concluded, however, that the Anti-Injunction Act, Declaratory Judgment Act and sovereign immunity do not bar this action. It is of course true, as appellants contend, that Congress has prescribed procedures for challenging administrative determinations of tax liability. Those procedures, however, are applicable only to cases involving the imposition of a tax, whereas here the challenge is made to a determination that certain hospitals are exempt from taxation as charitable organizations. We find no "clear and convincing evidence" that Congress intended to preclude judicial review in a case such as this.[12]

10. With respect to the question of whether the Declaratory Judgment Act is coterminous with the Anti-Injunction Act, the Court stated: "While we take no position on this issue, it is in any event clear that the federal tax exception to the Declaratory Judgment Act is at least as broad as the prohibition of the Anti-Injunction Act". 94 S.Ct. at 2057–2058, n. 10.

11. When the Declaratory Judgment Act was passed in 1934, the Act did not contain the phrase "except with respect to Federal taxes", which now appears in § 2201. Some taxpayers used the Declaratory Judgment Act to do what they were prohibited from doing under the Anti-Injunction Act. *See, e. g.* Penn v. Glenn, 10 F.Supp. 483 (W.D.Ky. 1935), app. dismissed per curiam, 84 F.2d 1001 (6 Cir. 1936), and F. G. Vogt and Sons, Inc. v. Rothensies, 11 F.Supp. 225 (E.D.Pa.1935). Congress reacted to this by amending the Declaratory Judgment Act to include the tax exemption provision (Act of August 30, 1935, Ch. 829, § 405, 49 Stat. 1027). As noted by this court in *Americans United, supra,* 477 F.2d at 1176:

"The Senate Finance Committee, in reporting out the amended version, stated that the 'application of the Declaratory Judgments Act to taxes would constitute a radical departure from the long-continued policy of Congress [as represented today by § 7421(a)] with respect to the determination, assessment, and collection of Federal taxes.'"

With this legislative history it appears clear that Congress intended the Declaratory Judgment Act § 2201 to be coterminous with the Anti-Injunction Act.

12. Appellants rely heavily on National Railroad Passenger Corp. v. National Assn. of Railroad Passengers, 414 U.S. 453, 94 S.Ct. 690, 38 L.Ed.2d 646 (1974). That case involved the question of whether an organiza-

If anything, the pertinent Congressional enactments indicate a Congressional intent that the actions of the Internal Revenue Service be subject to judicial review. The provision for review of the "assessment and collection" of taxes by the I.R.S. are the basis for many hundreds of taxpayer and I.R.S. suits every year. By means of refund and deficiency actions, the courts review the policies, practices, rulings, interpretations and actions of the Internal Revenue Service. Those cases cannot be commenced until after the assessment and collection of taxes. As noted *supra,* the rationale limiting suits to the post-collection period is not applicable in this case. To limit plaintiffs to a refund action under these facts is, as the district court concluded, equivalent to denying them judicial relief. That result is without foundation in the relevant law.

### III. VALIDITY OF REVENUE RULING 69–545

In holding that "Revenue Ruling 69–545 was improperly promulgated and is without effect", the district court concluded that "based on relevant judicial, legislative, and administrative decisions" the new Ruling constituted an unauthorized reversal of a long-established policy of requiring exempt hospitals "to offer special financial consideration to persons unable to pay". The court recognized

that "as a matter of jurisdiction and efficient tax administration . . . . courts have regularly paid deference to the expertise attributed to the I.R.S. in tax related matters and therefore judicial interference has been reluctantly employed". The court continued: "However, this exhibition of restraint is predicated upon the assumption that administrative rulings will do no more than effectuate, implement and clarify the provisions of the Code which have been Congressionally enacted. . . . When this assumption is proven wrong, the courts must act to rectify any administrative determination which is not in accord with the Code."

We do not disagree with these principles of judicial interpretation of administrative rulings, but our own analysis of the judicial, legislative, and administrative decisions leads to a contrary result. We conclude that Revenue Ruling 69–545 is not inconsistent with 26 U.S.C. § 501(c)(3) and that the modification of the prior ruling was authorized.

The definition of the term "charitable" has never been static and has been broadened in recent years. Prior to 1959, Treasury Regulations generally defined charitable organizations as those operated for the relief of the poor.[13] In 1959, however, a comprehensive set of regulations interpreting § 501(c)(3) was issued.[14] These regulations adopted

---

tion representing railroad passengers could bring an action to enjoin the discontinuance of certain passenger trains operated by the National Railroad Passengers Corporation (Amtrak). The Court concluded that the private citizens had no right to bring the injunctive action. The case, however, is not in point. There is a significant difference between forcing the Government to incur deficits by requiring the continuance of train service and forcing the Government to tax contributions to certain hospitals. Furthermore, in *National Railroad* the legislative history of Amtrak Act indicated a Congressional intent to preclude private causes of action. *Id.* at 694. No such Congressional intent is to be found with respect to the Internal Revenue Code. Finally, Congress in the Amtrak Act expressly provided that the Attorney General should have the right to secure judicial review. Here no judicial re-

view is possible except in an action by the plaintiffs.

13. *See,* e. g. Treas.Reg. § 39.101(b)–1(b) (1939 Code) which stated:

"Corporations organized and operated exclusively for charitable purposes comprise, in general, organizations for the relief of the poor."

*See also,* I.T. 1800, II–2 Cum.Bull. 152 (1923), a ruling of the Commissioner of the I.R.S., which held that the term "charitable" in the predecessor of Section 501(c)(3) was used in its more restrictive sense of relief of the poor, rather than its broader legal sense in the law of charities.

14. Revenue Ruling 56–185 was issued in 1956. Proposed regulations were also initially issued in 1956, repeating the restrictive view of charity contained in Ruling 56–185. (21 Fed.Reg. 460, 464 Jan. 21, 1956).

a broad concept of "charitable". The key provision, § 1.501(c)(3)–1(d)(2) reads:

"(2) *Charitable defined.* The term 'charitable' is used in section 501 (c)(3) in its generally accepted legal sense and is, therefore, not to be construed as limited by the separate enumeration in section 501(c)(3) of other tax exempt purposes which may fall within the broad outlines of 'charity' as developed by judicial decisions. Such term includes: Relief of the poor and distressed or of the underprivileged; advancement of religion; advancement of education or science; erection or maintenance of public buildings, monuments, or works; lessening of the burdens of Government; and promotion of social welfare by organizations designed to accomplish any of the above purposes, or (i) to lessen neighborhood tensions; (ii) to eliminate prejudice and discrimination; (iii) to defend human rights secured by law; or (iv) to combat community deterioration and juvenile delinquency."

This Treasury Regulation was cited in Green v. Connally, *supra*, wherein the three-judge district court stated with respect to § 501(c)(3):

" . . . clearly, the term 'charitable' is used 'in its generally accepted legal sense,' Treas.Reg. § 1.-501(c)(3)–1(d)(2), and not in a street or popular sense (such as, e. g.,

*benevolence to the poor and suffering).* See H. Reiling, 'What is a Charitable Organization?' 44 A.B.A. J. 525, 527 (1958). Thus 'strong analogy' can be derived from the general common law of charitable trusts, at least for close interpretative questions." 330 F.Supp. at 1157. (emphasis added).[15]

In promulgating Revenue Ruling 69–545, the Commissioner did rely on an analogy to the law of charitable trusts. As indicated earlier, the Commissioner cited both the Restatement (Second) of Trusts, sec. 368 and sec. 372,[16] and IV Scott on Trusts (3rd ed. 1967) sec. 368 and sec. 372 [17] in holding that the promotion of health is a charitable purpose within the meaning of § 501(c)(3).

The term "charitable" is thus capable of a definition far broader than merely the relief of the poor. The law of charitable trusts supports the broader concept. The question involved here then is whether the term "charitable" as used in § 501(c)(3) may be broadly interpreted as was done in Revenue Ruling 69–545 or is to be restricted to its narrow sense of relief of the poor.

We cannot conclude, as did the district court, that Congress intended the latter construction. While it is true that in the past Congress and the federal courts have conditioned a hospital's charitable status on the level of free or below cost care that it provided for indigents,[18]

These were withdrawn for more extensive study. The comprehensive set of regulations was proposed early in 1959 (24 Fed.Reg. 1421, 1423 Feb. 26, 1959) and, after public hearings, final regulations were issued, T.D. 6391, (24 Fed.Reg. 5217, 5219 June 26. 1959).

15. The court said in part: "Changes in the courts' conceptions of what is charitable are wrought by changes in moral and ethical precepts generally held, or by changes in relative values assigned to different and sometimes competing and even conflicting interests of society." *Id.* at 1159.

16. The Restatement (Second) of Trusts sec. 368 (1959) states:
"Charitable purposes include:
(a) the relief of poverty;

(b) the advancement of education;
(c) the advancement of religion;
(d) *the promotion of health;*
(e) governmental or municipal purposes;
(f) other purposes the accomplishment of which is beneficial to the community." (emphasis added).

17. Scott on Trusts, 3rd Ed. sec. 368, p. 2853 states "It is well settled that the promotion of health is a charitable purpose". Later in his treatise, Professor Scott observed that "a trust for the promotion of health, however, is nonetheless charitable although the benefits are not limited to the poor". Scott, *op. cit.* sec. 372, p. 2895.

18. Commissioner of Internal Revenue v. Battle Creek, Inc., 126 F.2d 405 (5 Cir. 1942); Davis Hospital, Inc., 4 CCH Tax.Ct.Memo.

there is no authority for the conclusion that the determination of "charitable" status was always to be so limited. Such an inflexible construction fails to recognize the changing economic, social and technological precepts and values of contemporary society.

In the field of health care, the changes have been dramatic. Hospitals in the early part of this nation's history were almshouses supported by philanthropy and serving almost exclusively the sick poor.[19] Today, hospitals are the primary community health facility for both rich and poor. Philanthropy accounts for only a minute percentage of the hospital's total operating costs.[20] Those costs have soared in recent years as constant modernization of equipment and facilities is necessitated by the advances in medical science and technology.[21] The institution of Medicare and Medicaid in the last decade combined with the rapid growth of medical and hospital insurance has greatly reduced the number of poor people requiring free or below cost hospital services. Much of that decrease has been realized since the promulgation of Revenue Ruling 56–185. Moreover, increasingly counties and other political subdivisions are providing nonemergency hospitalization and medical care for those unable to pay.[22] Thus, it appears that the rationale upon which the limited definition of "charitable" was predicated has largely disappeared.[23] To continue to base the "charitable" status of a hos-

312 (1945) ; Inter-City Hospital Association v. Squire, 56 F.Supp. 472 (W.D.Wash.1944) ; Goldsby King Memorial, 3 CCH Tax.Ct. Memo. 693 (1944) ; Lorain Avenue Clinic, 31 T.C. 141 (1958) ; Robert C. Olney, 17 CCH Tax.Ct.Mem. 982 (1958) ; Sonora Community Hospital, 46 T.C. 519 (1966), aff'd per curiam, 397 F.2d 814 (9 Cir. 1968).

19. As noted by one commentator :
"General hospitals were established in the United States as early as the 18th century to serve the sick, poor and offer a roof and bed for the homeless or for those whose homes were inadequate. These institutions were primarily the last resort of the sick. Their standards of care did not approach those for the simplest custodial care today." John H. Hayes, ed., Financing Hospital Care in the United States, Vol. I, "Factors Affecting the Cost of Hospital Care" (1954), p. 9.

20. Professor William Thomas speaking before a special Senate subcommittee in 1965 stated :
"The image of a voluntary institution as a charitable organization, financing its care of patients to a substantial degree through philanthropy . . . is largely anachronistic. Philanthropy, though increasing, has not been able to match the redoubled demands for health care." Hearings on Conditions and Problems of the Nation's Nursing Homes, Subcommittee on Long Term Care, Spec. Committee on Aging, U.S. Senate, 89th Cong., 1st Sess., Pt. 2 (Feb. 15, 1965), p. 559.

21. "Hospital expenses per patient day have increased over 700% since 1946, rising especially rapidly the last several years . . . . Among factors contributing to the rise in hospital expense are technological changes, increased demand, and rising costs of labor and supplies. . . . The public also demands more—a large number of more costly services—from the hospital now than it did two decades ago because of rising income, increasing insurance coverage, and changing demographic characteristics of the population." Basic Facts on the Health Industry, Committee on Ways and Means, 91st Cong., 1st Sess., June 28, 1971, p. 52.

22. The Supreme Court, in holding unconstitutional a state statute requiring a year's residence in a county as a condition to an indigent receiving nonemergency hospitalization or medical care at the county's expense, referred to the "astronomical costs of hospitalization which bear so heavily on the resources of most Americans" and the fact that the "financial pressures under which private nonprofit hospitals operate have already led many of them to turn away patients who cannot pay or to severely limit the number of indigents they will admit". Memorial Hospital v. Maricopa County, 415 U.S. 250, 265, 94 S.Ct. 1076, 1085, 39 L.Ed. 2d 306 (1974).

23. The state courts have recognized these changes in the health care field. As stated by the Supreme Court of Nebraska in Evangelical Lutheran Good Samaritan Society v. County of Gage, 181 Neb. 831, 151 N.W.2d 446, 449 (1967) :
"Formerly all institutions furnishing services of this nature, including hospitals and nursing homes, were providing care for many patients without compensation and extended charity in the sense of alms-giv-

pital strictly on the relief it provides for the poor fails to account for these major changes in the area of health care.

In holding Revenue Ruling 69–545 void, the district court placed undue emphasis on the fact that Congress in 1969 failed to amend the Internal Revenue Code by including language which would have conformed the Code to the new ruling. The Senate Finance Committee in deleting a House provision which would have allowed exempt status to institutions "organized and operated exclusively for the providing of hospital care" stated:

> "The committee deleted from the bill those provisions which would have conformed the code to the result reached by the 1969 ruling. The committee decided to reexamine this matter in connection with pending legislation on Medicare and Medicaid." [24]

This action or inaction by Congress cannot be interpreted as disapproving the new ruling. Congress could have rejected the ruling had it determined that it was not in conformity with the Code. Instead, it committed the matter for further study in the light of Medicare and Medicaid. No further action has been taken by Congress since the ruling became effective in 1969.

It is important to note also that Revenue Ruling 69–545 rather than overruling Revenue Ruling 56–185 simply provides an alternative method whereby a nonprofit hospital can qualify as a tax exempt charitable organization. That method entails the operation of an emergency room open to all regardless of their ability to pay and providing hospital services to those able to pay the cost either directly or through third party reimbursement. Thus, to qualify as a tax exempt charitable organization, a hospital must still provide services to indigents.

The required provision of emergency room services is of great import to the indigent. Emergency room service is often the only means of access that the poor have to medical care.[25] Furthermore, the fact that hospitals seeking to qualify as charities pursuant to Revenue Ruling 69–545 must accept Medicare and Medicaid patients is also significant. A large percentage of the indigent populace of the nation is now covered by either Medicare or Medicaid. In the final analysis, Revenue Ruling 69–545 may be of greater benefit to the poor than its predecessor Ruling 56–185.[26] Certainly Ruling 69–545 is more in conformity with the concept of "charitable" as de-

---

ing or free services to the poor. With the advent of present day social security and welfare programs, this type of charity is not often found because assistance is available to the poor under these programs. Yet, ' * * * the courts have defined "charity" to be something more than mere almsgiving or the relief of poverty and distress, and have given it a significance broad enough to include practical enterprises for the good of humanity operated at a moderate cost to those who receive the benefits.' "

24. Actually the provision of the House bill which was deleted provided a broader exemption than Revenue Ruling 69–545. It would have afforded exempt status to all nonprofit hospitals. Ruling 69–545 requires the operation of an emergency room open to all regardless of ability to pay as well as acceptance of Medicare and Medicaid patients and patients whose hospital costs will be paid by third parties.

25. "Finding a physician and getting health care is particularly difficult for families who change communities. A significant portion of these are poor. When health needs become critical, families that do not have adequate financial resources may find the emergency rooms and outpatient clinics of general hospitals the only available resource. These families, along with poor families, who often have no other alternative, have contributed to the 150 million emergency room and outpatient visits in 1967, an increase of 250% during the past two decades." National Advisory Commission on Health Facilities: A Report of the President (1969), p. 20.

26. Moreover, Revenue Ruling 69–545 sets forth a more definite and specific standard. Under Revenue Ruling 56–185 hospitals were required to provide free care only to the extent of their financial ability. Hospitals operating at a deficit would have no obligation under Ruling 56–185. In addition

fined in the Treasury Regulation adopted, after extensive study, in 1959 and interpreting § 501(c)(3).

■■■ In summary, we conclude that Revenue Ruling 69–545 is founded on a permissible definition of the term "charitable" and is not contrary to any express Congressional intent.

## IV. NOTICE AND HEARING REQUIREMENTS OF APA; ABUSE AND DISCRETION

Appellees contend that, if this court should find that the Commissioner was authorized to promulgate Revenue Ruling 69–545, the district court must nevertheless be sustained because appellants had the legal obligation under 5 U.S.C. § 553 to afford appellees an opportunity to be heard.[27] They argue that Revenue Ruling 69–545 is a substantive rule as opposed to an interpretative ruling and therefore § 553 of the APA is applicable.

Section 553 of the Administrative Procedure Act expressly excepts interpretative rules from the notice and hearing requirements of the Act. This court distinguished interpretative and substantive rules in Gibson Wine Co. v. Snyder, 90 U.S.App.D.C. 135, 194 F.2d 329 (1952):

"Generally speaking, it seems to be established that 'regulations', 'substantive rules' or 'legislative rules' are those which create law, usually implementary to an existing law; whereas interpretative rules are statements as to what the administrative officer thinks the statute or regulation means. . . . 'A substantive rule is one which . . . is intended to implement the statutory structure or the statutory powers of an agency. An interpretative rule is one which does not have the full force and effect of a substantive rule but which is in the form of an explanation of particular terms in an Act. If you had an expression in a statute such as 'Interurban Railway,' the query might come up as to what is an 'interurban railway.' A particular agency may adopt a rule defining an interurban railway. That, in a sense, may be called an interpretative rule.' " *Id.* at 331–332.[28]

■■■ Here the Commissioner interpreted the meaning of the term "charitable" in § 501(c)(3). The fact that the term had been interpreted by the Commissioner differently in an earlier revenue ruling is not controlling. In the meantime Treasury Regulations containing a broader concept of "charitable" had been adopted in 1959, after notice and public hearings. In our opinion Internal Revenue 69–545 conforms to the definition of "charitable" set forth in these Regulations. Furthermore, appellants concede that Revenue Ruling 69–545 has no independent binding effect and that the courts are not bound by it unless they choose to accept it as a proper interpretation of the meaning of the word "charitable" as used in § 501(c)(3).[29] We conclude that Revenue Ruling 69–545 is an interpretative ruling and is not subject to the requirements of § 553 of the APA.[30]

the Ruling qualified the "financial ability" standard by providing:

"The fact that its charity record is relatively low is not conclusive that a hospital is not operated for charitable purposes to the full extent of its financial ability . . . . It may also set aside earnings which it uses for improvements and additions to hospital facilities. . . . A nominal charity record for a given period of time, in the absence of charitable demands of the community, will not affect its right to continued exemption."

27. Having determined that the Revenue Ruling conflicted with Congressional intent, the district court did not reach appellees' contentions that the Ruling was promulgated without proper notice and hearing and constituted an abuse of discretion.

28. *Accord*, United States v. 353 Cases, etc., 247 F.2d 473, 480 (8 Cir. 1957).

29. *See*, American President Lines, Ltd. v. Federal Maritime Commission, 114 U.S.App.D.C. 418, 316 F.2d 419, 421–422 and n. 5 (1963).

30. Appellees lay great stress on the facts that (1) Revenue Ruling 69–545 has a substantial impact on the availability of hospital services for the poor; (2) the I.R.S. is not

Appellees finally contend that the promulgation of Revenue Ruling 69–545 constituted an abuse of discretion and should be set aside pursuant to 5 U.S.C. § 706(2)(A).[31] Appellees argue that the Internal Revenue Service acted without considering all of the relevant factors. Their primary attack is again levelled at an alleged failure of the I.R.S. to consider the needs of the poor.

We cannot agree. On its face, Revenue Ruling 69–545 indicates that the interests of the poor were considered. Emergency room treatment for all and acceptance of third-party reimbursement of hospital expenses were specifically established as conditions for tax exempt status under the Ruling. As indicated previously, both of those requirements substantially benefit the poor. Furthermore, the I.R.S. had before it a treasury regulation, 1.501(c)(3)–1(d)(2) *supra,* which expressly provided a broad definition of the term "charitable". In light of these factors and the changed health care situation in the country as a result of Medicare, Medicaid and other government programs, of which the I.R.S. was cognizant, the promulgation of Revenue Ruling 69–545 cannot be held to constitute an "abuse of discretion".

Reversed.

J. SKELLY WRIGHT, Circuit Judge (concurring in part and dissenting in part):

I concur in Part II of the court's opinion affirming the District Court on the jurisdictional issues raised on this appeal. On the merits I would also affirm the District Court for the reasons stated in its opinion holding Revenue Ruling 69–545 invalid. *See* Eastern Kentucky Welfare Rights Organization v. Shultz, D.D.C., 370 F.Supp. 325 (1973).

Assuming the defendants had the legal right to eliminate the requirement that nonprofit hospitals serve indigents in order to be eligible for "charitable" tax status under the Code, I would still find Revenue Ruling 69–545 invalid because it was issued without compliance with the informal rule-making procedures required by Section 553 of the Administrative Procedure Act, 5 U.S.C. § 553 (1970). Revenue Ruling 69–545 replaced Revenue Ruling 56–185 which provided that a hospital could qualify for tax exempt status only if it was "operated to the extent of its financial ability for those not able to pay for the services rendered and not exclusively for those who are able and expected to pay." Revenue Ruling 69–545 provided "Revenue Ruling 56–185 is hereby modified to remove therefrom the requirements relating to caring for patients without charge or at rates below cost." Thus Revenue Ruling 69–545 worked a substantial change in the availability of hospital services for the poor. Yet, admittedly, neither the poor nor anyone else was given notice of the proposed change or allowed to comment on it.

The Internal Revenue Service is not expert in health care delivery needs and, consequently, was unable to draw on any expertise of its own in determining to free "charitable" hospitals from their obligations under existing IRS rulings to serve the poor. Comment from disciplines more directly related to health care and poverty could doubtless have assisted the IRS in deciding whether to relax the obligations of these hospitals to the poor. In proceeding without complying with the requirements of the Administrative Procedure Act, the IRS denied itself access to education which would have allowed it to make a more informed judgment. "Section 553 was enacted to give the public an opportuni-

an expert in health care delivery problems and thus needs to be educated; and (3) the Ruling constitutes a reversal of longstanding I.R.S. policy. While these factors have been considered by the courts with respect to whether notice and hearing are required by the APA, they are not determinative here

where a ruling is clearly interpretative in nature and has no legally binding effect.

31. 5 U.S.C. § 706(2)(A) authorizes courts to set aside agency actions found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law".

ty to participate in the rule-making process. It also enables the agency promulgating the rule to educate itself before establishing rules and procedures which have a substantial impact on those regulated." Texaco, Inc. v. FPC, 3 Cir., 412 F.2d 740, 744 (1969).

Before BAZELON, Chief Judge, and WRIGHT, McGOWAN, TAMM, LEVENTHAL, ROBINSON, MacKINNON, ROBB and WILKEY, Circuit Judges.

## ORDER

PER CURIAM.

Appellees' suggestion that the matter be considered *en banc* having been circulated to the full court, and there not being a majority of the judges in regular active service in favor of having this case reheard *en banc*, it is

Ordered by the court *en banc* that appellees' aforesaid suggestion is denied.

Statement of BAZELON, Chief Judge, with whom J. SKELLY WRIGHT and SPOTTSWOOD W. ROBINSON, III, Circuit Judges, concur, as to why he voted to grant rehearing *en banc*.

Statement of J. SKELLY WRIGHT, Circuit Judge, with whom BAZELON, Chief Judge, and SPOTTSWOOD W. ROBINSON, III, Circuit Judge, concur, as to why he voted to grant rehearing *en banc*.

Statement of BAZELON, Chief Judge, as to why he voted to grant rehearing *en banc*:

I concur in Judge Wright's dissent and statement as to why he voted to grant rehearing *en banc* on the issue of compliance with the rulemaking procedures of the Administrative Procedure Act, 5 U.S.C. § 553 (1970). I add only this further thought. The panel opinion concedes, as it must, that rulemaking procedures are required if Rev.Rul. 69–545 has an "independent binding effect." If the Rev.Rul. were no more than "an opinion of the legal staff" of the Treasury,[1] I might agree with the majority that courts "are not bound by [the Revenue Ruling] unless they choose to accept it" and that, therefore, the Rev.Rul. has no independent binding effect. But in light of the traditional deference to Internal Revenue Service regulations in the interpretation of the more general sections of the Internal Revenue Code of 1954,[2] I think it a truly heroic assumption that courts will not be bound by the Ruling "unless they choose to accept it." Indeed, this tradition of deference informs the panel majority's own approach to the legality of Rev.Rul. 69–545. The majority does not review the issue *de novo* but instead concludes that the Ruling "is founded on a *permissible* definition of the term 'charitable' and is not contrary to any *express* Congressional intent."[3] If the majority were to re-

1. American President Lines, Ltd. v. Federal Maritime Comm'n, 114 U.S.App.D.C. 418, 316 F.2d 419, 422 (1963). *See* Hou Ching Chow v. Attorney-General, 362 F.Supp. 1288, 1292 (D.D.C.1973); Continental Oil Co. v. Burns, 317 F.Supp. 194 (D.Del.1970). *Cf.* Pacific Gas & Elec. Co. v. FPC, 164 U.S. App.D.C. ——, at ——, n. 14, —— ——, 506 F.2d 33, at 37, n. 14, 38–40 (1974); Lewis-Mota v. Secretary of Labor, 469 F.2d 478 (2d Cir. 1972); California Citizens Band Ass'n v. United States, 375 F.2d 43 (9th Cir.), cert. denied, 389 U.S. 844, 88 S.Ct. 96, 19 L.Ed.2d 112 (1967). There is nothing in Gibson Wine Co. v. Snyder, 90 U.S.App.D.C. 135, 194 F.2d 329 (1952), which is inconsistent with these cases. There is, I think no one would doubt, a very substantial difference between regulations defining a type of grape and regulations inter-

preting such legislative phrases as "the public interest" or "tax avoidance purpose."

2. *See* United States v. Cartwright, 411 U.S. 546, 550, 93 S.Ct. 1713, 36 L.Ed.2d 528 (1973); Bingler v. Johnson, 394 U.S. 741, 749–751, 89 S.Ct. 1439, 22 L.Ed.2d 695 (1969); Commissioner of Internal Revenue v. South Texas Lumber Co., 333 U.S. 496, 501, 68 S.Ct. 695, 92 L.Ed. 831 (1948); Commissioner of Internal Revenue v. O. Liquidating Corp., 292 F.2d 225, 231 (3d Cir.), cert. denied, 368 U.S. 898, 82 S.Ct. 177, 7 L.Ed.2d 94 (1961); Kern v. Granquist, 291 F.2d 29, 32 (9th Cir. 1961). *Compare* Kurzner v. United States, 413 F.2d 97, 112 (5th Cir. 1969) *with* O'Neill v. United States, 410 F.2d 888 (6th Cir. 1969).

3. At 1290 (emphasis added).

view the issue *de novo*, it would, I take it, certainly want more information than is contained in the record before us here. And it is for expressly that reason, as Judge Wright so persuasively argues, that rulemaking hearings are required.[4] So the majority tells the plaintiffs that it will not be bound by the Internal Revenue Service interpretation of the term "charitable" and then turns right around and upholds the Service interpretation as a permissible exercise of discretion on the basis of factual assumptions which are not supported by a record and which plaintiffs have not had an opportunity to rebut. I will not concur in such reasoning.

Statement of J. SKELLY WRIGHT, Circuit Judge, as to Why He Voted to Grant Rehearing *En Banc*

Revenue Ruling 69–545, which the panel majority upholds, replaced Revenue Ruling 56–185 which provided that a hospital could qualify for tax exempt status only if it was "operated to the extent of its financial ability for those not able to pay for the services rendered and not exclusively for those who are able and expected to pay." Revenue Ruling 69–545 provides: "Revenue Ruling 56–185 is hereby modified to remove therefrom the requirements relating to caring for patients without charge or at rates below cost." Thus Revenue Ruling 69–545 worked a substantial change in the availability of hospital services for the poor. Yet, admittedly, neither the poor nor anyone else was given notice of the proposed change or allowed to comment on it.

On the basis of assumed social, economic, and technological changes in the need of the poor for free medical care, the panel majority approves Revenue Ruling 69–545. The record in this case does not reflect what the needs of the poor for free medical care really are because the Internal Revenue Service did not comply with the rule-making procedures required by Section 553 of the Administrative Procedure Act, 5 U.S.C. § 553 (1970). Thus millions of poor people are effectively denied medical care without the procedural protections provided by law. If these procedural protections had been provided, doubtless it would have been disclosed that millions of Americans are indeed too poor to pay for hospital services and have no means of obtaining those services except as charity patients at our nonprofit hospitals. With this fact established as a matter of record, I confidently believe that Revenue Ruling 69–545 would never have been promulgated in the first place.

I would affirm the District Court in this case for the reasons stated in its opinion holding Revenue Ruling 69–545 invalid (*see* Eastern Kentucky Welfare Rights Organization v. Shultz, D.D.C., 370 F.Supp. 325 (1973)). I would also hold Revenue Ruling 69–545 invalid because it was issued without compliance with the rule-making procedures required by Section 553 of the Administrative Procedure Act, 5 U.S.C. § 553, as indicated in my dissent to the panel opinion.

---

4. *See also* NLRB v. Wyman-Gordon Co., 394 U.S. 759, 775–780, 89 S.Ct. 1426, 22 L.Ed.2d 709 (1969) (Douglas, J., dissenting).