INVESTMENT ANNUITY, INC., et al., Plaintiffs,

v.

W. Michael BLUMENTHAL et al., Defendants.

Civ. A. No. 77–810.

United States District Court, District of Columbia.

Nov. 9, 1977.

See also 437 F.Supp. 1095.

Herbert L. Awe, William L. Goldman, Joseph B. Levin, Washington, D. C., Arthur P. Hartel, Jr., Valley Forge, Pa., for plaintiffs.

Donald J. Gavin, John M. Cunningham, Washington, D. C., for defendants.

## MEMORANDUM OPINION

CHARLES R. RICHEY, District Judge.

This case is ·now before the Court for a final determination on the merits. Initially, this case came before the Court on plaintiffs' motion for preliminary injunction. Defendants then filed a motion to dismiss on the ground that the instant action was barred by the Anti-Injunction Act, 26 U.S.C. § 7421(a) (1970). While the Court had these initial motions under advisement, the parties, on June 27, 1977, stipulated that no material facts were in dispute and that a final disposition of the case on the merits would be appropriate.

After deferring ruling on defendants' motion to dismiss in order to permit plaintiffs to make good-faith efforts to challenge the revenue ruling here in issue in either the Tax Court or in a refund action,[1] and based on its finding that "this case is one 'in which the aggrieved party has *no access at all* to judicial review,' *Bob Jones University v. Simon,* 416 U.S. 725, 747, 94 S.Ct. 2038, 40 L.Ed.2d 496 (1974)," the Court, by Order of

---

1. The Court had initially ruled from the Bench on June 17, 1977, and denied defendants' motion to dismiss. The Court then reconsidered this denial and determined that a final ruling on the motion to dismiss should be deferred pending the efforts described in the text of the present opinion. The stipulation referred to in the text of the present opinion was presented to the Court prior to the issuance of the Court's · Memorandum Opinion of July 12, 1977, which reconsidered the initial denial of the motion to dismiss.

September 28, 1977, denied defendants' motion to dismiss. Accordingly, pursuant to the stipulation of the parties, the case is now before the Court for a final determination upon the merits as provided for by Fed.R.Civ.P. 56(c).

## I. BACKGROUND AND FACTS

Since the facts of this case set forth in the Court's initial Memorandum Opinion of July 12, 1977, on the motion to dismiss remain unchanged, the Court will quote the Background section of that opinion in order to provide the reader of this opinion with a recapitulation of the essential facts involved in this dispute:

This case concerns the tax treatment to be accorded to what have been termed *investment annuity contracts.* Specifically, the legal issue before the Court is whether investment annuity contracts are "contracts with reserves based on a segregated asset account" within the meaning of section 801(g)(1)(B) of the Internal Revenue Code, 26 U.S.C. § 801(g)(1)(B).

An investment annuity contract is like a conventional annuity contract in that both involve the purchase by the policyholder of a promise by the insurer to make payments to the annuitant at a specified maturity date (often the annuitant's date of retirement). As in the case of all annuities, the investment annuity is predicated on actuarily-derived mortality and expense guaranties made to the policyholder by the insurance company. An investment annuity is like a variable annuity (and unlike a fixed-dollar annuity) in that the amount of the annuities paid on or after the maturity date reflect the investment return and market value of the "segregated asset account." The unique feature of an investment annuity contract—and the only substantive difference between it and other variable annuity arrangements—is that a separate "segregated asset account," known as a "custodial account," is established for each investment annuity contract, and the policyholder (rather than the insur-

ance company) directs how the assets in the custodial account are to be invested.[1]

[1] The "custodial account" is so-called because it is administered by a third-party custodian, generally a bank selected by the policyholder.

This case arises out of the action of the Internal Revenue Service (IRS) in issuing Revenue Ruling 77–85 on March 9, 1977. Internal Revenue Bulletin No. 1977–15, at 7–9 (April 11, 1977). Prior to that date, and since 1965,[2] the IRS had treated

[2] The first letter ruling on the tax treatment to be accorded investment annuity contracts is dated August 10, 1965. (Exhibit B, Letter from John W. S. Littleton, Director, Income Tax Division, to John A. Cardon). Subsequent letter rulings consistent with this 1965 ruling were issued on November 8, 1965 (Exhibit C), November 29, 1967 (Exhibit D), and April 25, 1972 (Exhibit E).

On October 20, 1976, the Service announced in News Release IR–1679 that it was reconsidering the tax treatment accorded investment annuity contracts.

investment annuity contracts as conventional segregated asset annuity accounts with the result that they were entitled to the favorable tax treatment afforded by section 801(g)(1)(B). In brief, the tax advantages of such treatment are: (1) the annual investment return of the segregated asset account is included not in the policyholder's gross income, but rather in the investment yield of the insurance company, see 26 U.S.C. § 804(c), with the result that such investment return is taxed to the insurance company at a "favorable" rate; and (2) when the annuities are paid upon maturity, the gain reflected in the annuity payments, see 26 U.S.C. §§ 72(a)–(c), is then included in the annuitant's gross income.[3] Rev-

[3] An annuitant will benefit from such "deferred" tax treatment if, when the annuity is paid, the annuitant has less taxable income (and is thus in a lower tax bracket) than he has in the year(s) the investment yields profits.

enue Ruling 77–85 reversed the previous determination by the IRS and held that investment annuity contracts are *not* "contracts with reserves based on a segregated asset account" within the meaning of section 801(g)(1)(B). The effect of this ruling is that all income produced by the assets in the custodial account are includible in the gross income of the poli-

cyholder for the year in which they become added to the custodial account. The Ruling did, however, "grandfather" all existing investment annuity contracts by holding that all such contracts will continue to be treated for tax purposes as "contracts with reserves based on segregated asset accounts" within the meaning of section 801(g)(1)(B).

Plaintiffs herein are Investment Annuity, Inc. (IA) and First Investment Annuity Co. (FIAC). FIAC is a wholly-owned subsidiary of IA and is IA's sole business. FIAC is licensed in Pennsylvania as a legal reserve life insurance company and was organized for the purpose of issuing and marketing investment annuities of various types. Upon being advised of the substance of Revenue Ruling 77–85, as well as actions taken by the Securities and Exchange Commission and the Insurance Commissioner of the Commonwealth of Pennsylvania in anticipation of the ruling,[4] plaintiff FIAC immediately

[4] FIAC had been selling its investment annuity contracts in reliance on a no-action letter issued by the Securities and Exchange Commission. On March 7, 1977, the SEC, in anticipation of Revenue Ruling 77–85, rescinded its no-action assurance. Also in anticipation of Revenue Ruling 77–85, the Insurance Commissioner of the Commonwealth of Pennsylvania, on March 8, 1977, notified FIAC that no further sales of investment annuity contracts could be made without his prior approval.

ceased selling investment annuity contracts. It has not, since March 9, 1977, sold any new investment annuity contracts, nor has it received any additional contributions to existing accounts. Plaintiffs now seek a declaratory judgment that Revenue Ruling 77–85 is unlawful, beyond statutory authority, and in violation of the Internal Revenue Code. In addition, they seek injunctive relief to restrain the defendants from implementing Revenue Ruling 77–85 and from refusing to treat investment annuity contracts as within the purview of section 801(g)(1)(B).

In addition to the undisputed facts set forth above, one other sequence of events, also undisputed, is pertinent to the Court's consideration of the merits: On August 29, 1977, the Internal Revenue Service issued to a competitor of plaintiff FIAC a private ruling which declared that certain variable annuity contracts were considered to be "contract[s] with reserves based on a segregated asset account" within the meaning of section 801(g)(1)(B) of Title 26 of the United States Code. The annuity contracts that were the subject of this private ruling permitted substantial investment control on the part of the policyholder not materially different in degree than the amount of policyholder investment control inherent in the investment annuity contracts marketed by plaintiff FIAC. Upon learning of this private ruling, plaintiffs filed a motion seeking immediate entry of judgment in their favor. The Court then, upon finding that the private ruling of August 29, 1977, raised "grave questions about the propriety of Revenue Ruling 77–85," ordered the defendants to respond immediately to plaintiff's allegations. Defendants thereafter, on September 13, 1977, revoked the August 29, 1977, private ruling.

## II. REVENUE RULING 77–85

As indicated above, plaintiffs herein seek judicial review of Revenue Ruling 77–85 which reversed a series of private rulings that had declared that the investment annuity contracts marketed by plaintiff FIAC were "contracts with reserves based on a segregated asset account" within the meaning of 26 U.S.C. § 801(g)(1)(B). Significantly, the basis for the Service's determination that investment annuity contracts are not within the purview of section 801(g)(1)(B) was *not* that these contracts failed to satisfy the express statutory criteria of section 801(g)(1)(B). Rather, the Ruling was premised expressly on the Service's determination that an investment annuity policyholder's "substantial incidents of ownership" with regard to the assets in the custodial account, and particularly his investment control over such assets, warrant the conclusion that the policyholder and not the issuing life insurance company is the owner of the custodial account assets for federal

tax purposes. And, reasoned the ruling, since the life insurance company cannot be taxed at all for the income derived from assets which are owned by another taxpayer (here, the policyholder), section 801(g)(1)(B) and the other Code provisions governing life insurance company taxation do not apply to the custodial account assets of an investment annuity contract.

## III. STANDARD OF REVIEW

■ In reviewing Revenue Ruling 77–85, this Court is guided by the well-established principles articulated by Judge Parker in *Eastern Kentucky Welfare Rights Organization v. Shultz,* 370 F.Supp. 325, 334–35 (D.D.C.1973), *rev'd on other grounds sub nom. Eastern Kentucky Welfare Rights Organization v. Simon,* 165 U.S.App.D.C. 239, 506 F.2d 1278 (D.C.Cir. 1974), *vacated on other grounds,* 426 U.S. 26, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976), which were approved on appeal by the Court of Appeals for this Circuit:

> Any discretion incorporated into the IRS's authority to promulgate rules and regulations is necessarily limited by the understanding that Congress, not the Treasury, is responsible for the formulation and institution of basic tax policy. It is true, as a matter of jurisprudence and efficient tax administration, that courts have regularly paid deference to the expertise attributed to the IRS in tax related matters and therefore judicial interference has been reluctantly employed. However, this exhibition of restraint is predicated upon the assumption that administrative rulings will do no more than effectuate, implement and clarify the provisions of the Code which have been congressionally enacted. . . . When this assumption is proven wrong, the courts must act to rectify any administrative determination which is not in accord with the Code.

165 U.S.App.D.C. at 247, 506 F.2d at 1286.

This principle of judicial review—that the IRS has no authority to take administrative actions inconsistent with the Internal Reve-

nue Code—has been uniformly embraced by the courts.[2] *See, e. g., Manhattan General Equipment Co. v. Commissioner,* 297 U.S. 129, 134, 56 S.Ct. 397, 400, 80 L.Ed. 528 (1936) ("A regulation which . . . operates to create a rule out of harmony with the statute is a mere nullity."); *Service Life Insurance Co. v. United States,* 293 F.2d 72, 77 (8th Cir. 1961) ("It is elementary that revenue rulings and even Treasury Regulations are without force if they are in conflict with the statute."); *Russell v. United States,* 260 F.Supp. 493, 500 (N.D.Ill. 1966) ("A revenue ruling which runs counter to the provisions of a statute is a legal nullity.") It is also well-established that even where the IRS's interpretation of the Code is not expressly inconsistent with the statutory language, such an interpretation will not be sustained if it is "unreasonable and unrealistic." *United States v. Cartwright,* 411 U.S. 546, 551, 93 S.Ct. 1713, 36 L.Ed.2d 528 (1973). *See Coca-Cola Bottling Co. v. United States,* 203 Ct.Cl. 18, 487 F.2d 528, 532 (1973); *McMartin Industries, Inc. v. Vinal,* 441 F.2d 1274, 1275–76 (8th Cir. 1971); *Quaker City Iron Works, Inc. v. United States,* 256 F.Supp. 450, 453 (E.D.Pa. 1966).

■ The above-articulated principles of judicial review are appropriately applied in all cases in which IRS action is challenged. However, when, as in the instant case, the action challenged is the issuance of a revenue ruling (rather than a regulation or a Treasury Decision), the reviewing court must bear in mind that

> [a revenue] ruling is merely the opinion of a lawyer in the agency and must be accepted as such. It may be helpful in interpreting a statute, but it is not binding on the Secretary or the courts. It does not have the effect of a regulation or a Treasury Decision.

*Stubbs, Overbeck & Associates v. United States,* 445 F.2d 1142, 1146–47 (5th Cir.

---

**2.** In the language of the APA, administrative actions that are inconsistent with the Internal Revenue Code are "not in accordance with law," 5 U.S.C. § 706(2)(A), and are "in excess of statutory . . . authority." 5 U.S.C. § 706(2)(C).

1971). Revenue rulings are *not* intended to create legally binding rights and/or obligations, and they are consistently treated as such by the Service for purposes of the procedural requirements of the Administrative Procedure Act, 5 U.S.C. § 553. Revenue rulings thus fit "the classic definition of an 'interpretative rule.'" Brief for the Secretary of the Treasury, *Eastern Kentucky Welfare Rights Organization v. Simon,* 426 U.S. 26, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976), at 102. *See generally* Asimow, *Public Participation in the Adoption of Interpretive Rules and Policy Statements,* 75 Mich.L.Rev. 521 (1977); Comment, *Revenue Rulings and the Federal Administrative Procedure Act,* 1975 Wisc.L.Rev. 1135. As such, this Court's review "is not limited to determining 'arbitrariness.'" K. Davis, *Administrative Law of the Seventies,* § 5.03–1, at 154 (1976). Rather, if this Court, after giving *due* deference to the agency's expertise, finds the Service's statutory interpretation as embodied in Revenue Ruling 77–85 to be erroneous, this Court can, and indeed must, substitute its judgment for that of the Service.

## IV. REVENUE RULING 77–85 IS AN ERRONEOUS AND UNREASONABLE INTERPRETATION OF THE INTERNAL REVENUE CODE, AND, IN VIEW OF THE FACT THAT SUBSTANTIAL DEFERENCE TO THE AGENCY'S EXPERTISE IS NOT WARRANTED BY THE FACTS OF THIS CASE, THE COURT WILL DECLARE THE RULING TO BE UNLAWFUL AND BEYOND THE SERVICE'S STATUTORY AUTHORITY

The Court has given careful and serious consideration to the arguments propounded by both sides in this controversy. While as a general rule this Court is, as are most other courts, *see Eastern Kentucky Welfare Rights Organization v. Shultz,* 370 F.Supp. at 334, *quoted supra,* reluctant to interfere with the IRS in tax-related matters, application of the aforestated principles of judicial review to the Service's decision in Revenue Ruling 77–85 compels this Court to conclude that Revenue Ruling 77–85 is erroneous and unreasonable, and therefore unlawful and beyond the Service's statutory authority. Accordingly, for the reasons hereinafter stated, the Court will grant plaintiffs the declaratory relief they seek.

A. *Revenue Ruling 77–85 Is Unlawful And Beyond The Service's Statutory Authority In That Its Determination That The Policyholder, Rather Than The Issuing Life Insurance Company, Is The Owner Of The Investment Annuity Custodial Account Assets Is Erroneous And Unreasonable.*

### 1. Statutory Language

The starting point for analysis of the correctness of Revenue Ruling 77–85 must of course be the express statutory language of sections 801(g)(1)(B) and 61, the pertinent Code provisions. Revenue Ruling 77–85 does *not* dispute the fact that the investment annuity contractual arrangements described above satisfy all the express requirements of section 801(g)(1)(B), which provides:

—For purposes of this part, a "contract with reserves based on a segregated asset account" is a contract—

(i) which provides for the allocation of all or part of the amounts received under the contract to an account which, pursuant to State law or regulation, is segregated from the general asset accounts of the company,

(ii) which provides for the payment of annuities, and

(iii) under which the amounts paid in, or the amount paid as annuities, reflect the investment returned and the market value of the segregated asset account.

If a contract ceases to reflect current investment return and current market value, such contract shall not be considered as meeting the requirements of clause (iii) after such cessation.

While defendants, in their litigation memoranda, have attempted to interject the argument that investment annuity contracts do not satisfy the express requirements of

section 801(g)(1)(B) because the term "received" in clause (i) requires investment control over the account assets to be received by the insurance company, the Court finds this interpretation to be strained, unsupported, and wholly untenable. Thus, the statutory language of section 801(g)(1)(B) is of little help to the Court. Similarly, the exceedingly general language of section 61, which defines "gross income," offers no guidance to the Court.

### 2. Legislative History

Accordingly, the Court must next turn to the legislative history of sections 61 and 801(g)(1)(B). Here again, however, the Court finds no guidance. As both parties readily admit, the concept of an "investment annuity contract" was unknown to Congress when it passed section 61 of the Internal Revenue Code in 1954, and it was also unknown when Congress passed the original version of section 801(g) in 1959 and the present version of section 801(g)(1)(B) in 1962. Defendants, however, have pointed to several references in the legislative histories of both the 1959 and 1962 enactments that speak of "the insurance company's investment experience." *See, e. g.,* S.Rep. No. 86–291, 86th Cong., 1st Sess. 35 (1959), U.S.Code Cong. & Admin. News 1959, p. 1575; S.Rep. No. 87–2109, 87th Cong., 2d Sess. 7 (1962), U.S.Code Cong. & Admin.News 1962, p. 3890. Defendants argue that since Congress only contemplated annuity arrangements wherein the insurance company exercised investment control, and since Congress expressly focused on this aspect of annuity contracts in the legislative history, Congress must have intended to limit the applicability of section 801(g)(1)(B) to standard variable annuities.

The Court finds defendants' argument entirely unpersuasive: The mere fact that Congress did not consider an as-yet uninvented alternative to a "statutorily-approved" arrangement cannot be said to *bar* application of the statute to a later-invented alternative if that alternative is comparable to the "approved" arrangement in substantially all respects. Defendants'

construction ignores the generally-accepted canon of statutory construction that where "Congress has made a choice of language which fairly brings a given situation within a statute, it is unimportant that the particular application may not have been contemplated by the legislators." *Gelfand v. United States,* 179 Ct.Cl. 575, 584, 375 F.2d 807, 813 (1967), *quoting Barr v. United States,* 324 U.S. 83, 90, 65 S.Ct. 522, 89 L.Ed. 765 (1954). *See* 2A *Sutherland Statutory Construction,* § 49.02 (Sands ed. 1973). As the Ninth Circuit suggested in *Pool v. Commissioner,* 251 F.2d 233, 237–38 (1957), *cert. denied,* 356 U.S. 938, 78 S.Ct. 780, 2 L.Ed.2d 813 (1958), this principle is particularly apposite to tax cases:

> The excellence of our jurisprudence is its flexibility. In applying general statutory language to particular situations, courts best conform to the tradition of growth of our system when they adapt realistically general principles to different or constantly changing situations. In applying tax statutes, the best result is always achieved when we avoid harsh crystallizations.

For these reasons, this Court concludes that the legislative history should not be read as either expressly or implicitly supporting defendants' constricted interpretation of section 801(g)(1)(B).

### 3. Analysis of the Service's Ruling

In view of the dearth of guidance provided by both the statutory language and legislative history of both sections 61 and 801(g)(1)(B), the Court must analyze Revenue Ruling 77–85 in terms of its reasonableness and consistency with other provisions of the Internal Revenue Code. As section II, *supra,* states, Revenue Ruling 77–85 "was premised expressly on the Service's determination that an investment annuity policyholder's 'substantial incidents of ownership' with regard to the assets in the custodial account, and particularly his investment control over such assets, warrant the conclusion that the policyholder and not the issuing life insurance company is the owner of the custodial account assets for

federal tax purposes." Defendants assert, and plaintiffs do not disagree, that "the determination of the ownership of a given set of assets requires the weighing of all of the various property rights attaching to those assets . . . ." Defendants' Supplemental Memorandum on the Merits, at 5 (October 4, 1977). While defendants at various times in this litigation have likened investment annuity contracts to other transactional forms (e. g., pledge, trust, escrow account), they admit that

> ultimately the Court must weigh on their own terms all of the rights which a FIAC policyholder retains in the assets he contributes to his custodia[l] account and all of the rights which he surrenders; and the Court must resolve the question of the ownership of those assets in light of this ultimately *sui generis* evaluative process.

*Id.* at 5.

■ There can be no doubt that investment annuity policyholders retain substantial rights in the custodial account assets. Nevertheless, the Court finds that the following reasons warrant the conclusion that the investment annuity policyholder is *not* the owner of the account assets and should not be taxed as such:

*First,* in weighing the rights retained against the rights surrendered by an investment annuity policyholder, the Court finds that the rights surrendered by the policyholder are sufficiently extensive to divest him of ownership for the purposes of the tax laws. In reaching this conclusion, the Court is guided by the seminal case of *Helvering v. Clifford,* 309 U.S. 331, 60 S.Ct. 554, 84 L.Ed. 788 (1940). In that case, the Supreme Court held that the creation of a trust, the corpus of which consisted of certain securities owned by the grantor-respondent, did not enable the grantor to escape federal tax liabilities for income earned by the trust. The Court emphasized that the grantor had retained total control over the management of the securities that comprised the trust corpus, that the transaction was totally intra-familial, *and* that the duration of the trust was only five years, at which time the corpus would be returned to the grantor. On the basis of these factors, the Court concluded:

> So far as his dominion and control were concerned it seems clear that the trust did not effect any substantial change. In substance his control over the corpus was in all essential respects the same after the trust was created as before. The wide powers which he retained included for all practical purposes most of the control which he as an individual would have. There were, we may assume, exceptions, such as his disability to make a gift of the corpus to others during the term of the trust and to make loans to himself. But this dilution in his control would seem to be insignificant and immaterial, since control over investment remained. If it be said that such control is the type of dominion exercised by any trustee, the answer is simple. We have at best a temporary reallocation of income within an intimate family group. Since the income remains in the family and since the husband retains control over the investment, he has rather complete assurance that the trust will not effect any substantial change in his economic position. . . . For as a result of the terms of the trust and the intimacy of the familial relationship respondent retained the substance of full enjoyment of all the rights which previously he had in the property.

309 U.S. at 335–36, 60 S.Ct. at 556–57.

In contrast to the respondent in *Clifford,* investment annuity policyholders have manifestly effected a "substantial change" in their economic positions. While they retain investment control over the account assets, they by no means retain control over such assets "in all essential respects" as before the investment. As Revenue Ruling 77–85 itself recognizes, investment annuity policyholders are unable to receive the account assets back in kind should they exercise their cash surrender option, and they may not receive any amount directly from the account. This impairment of rights is neither insignificant nor immaterial: Should the policyholder surrender the contract prior to annuitization, he would have to accept

the liquidated value of the account assets (instead of the assets—securities, bonds, etc.—themselves), and he would have to pay full taxes at that time for any appreciation in the account assets from the time the custodial account was established. Thus, unlike the situation in *Clifford,* the investment annuity policyholder forfeits the right to own the account assets in an unliquidated form and assumes the obligation to pay full taxes on asset appreciation should he exercise his right of surrender. The policyholder also divests himself of another important incident of ownership in that after annuitization there can be no policy surrender. In other words, once annuitization of the policy occurs, the policyholder has no right even to receive the liquidated value of the account assets. Accordingly, the Court concludes that the policyholder of an investment annuity contract surrenders substantial enough ownership rights to warrant the conclusion that he is divested of the ownership of the account assets.

*Second,* the retention of investment control by the policyholder is not such a significant incident of ownership to warrant disparate treatment of investment annuity contracts and standard variable annuity contracts. As defendants concede, the *sole* difference between investment annuity contracts and standard variable annuity contracts is the investment control of the policyholder; and there is no question that the account assets of variable annuity contracts are owned for tax purposes by the issuing life insurance company, despite the fact that the policyholder of a standard variable annuity possesses the same surrender rights as the policyholder of an investment annuity. While the ability to control investment decisions is one attribute of ownership, it is not necessarily determinative of ownership. Thus, for example, under 26 U.S.C. § 675, the grantor of a trust is not considered the owner merely because he exercises plenary control over investment decisions; rather, he is considered the owner if he exercises such investment control where "the trust funds consist of stocks or securities of corporations in which the holdings of the grantor and trust are significant from the viewpoint of voting control." In

view of the incidents of ownership surrendered by the policyholder upon creation of the custodial account, retention of investment control is *not* so significant that the failure to transfer such control to the issuing life insurance company should deprive that company of ownership for taxation purposes, particularly since in both situations the insurance company (1) maintains reserves as required by state law, and (2) assumes the mortality risks for the policyholder. The Court therefore concludes that the distinction drawn by Revenue Ruling 77–85 is unreasonable in light of all the facts of this case.

*Third,* attribution of ownership of the account assets to the policyholder produces some unreasonable results. In particular, the Service's interpretation would result in current taxation of the appreciation of the account assets even though the policyholder may *never* receive that income or any benefit derived therefrom. Similarly, the Service's interpretation results in treatment of the policyholder as owner of the account assets *even after* annuitization commences—*i. e.,* even after he forfeits any right whatsoever to surrender the contract and receive the liquidated value of the account assets. These seemingly unreasonable results, and perhaps others of which the Court is unaware at this time, provide yet another reason for concluding that the issuing life insurance company and not the policyholder should be considered the owner of the investment annuity custodial account assets for federal tax purposes.

B. *The Service's Decision In Revenue Ruling 77–85 Was Not Contemporaneous With The Enactment Of Section 801(g)(1)(B), Does Not Reflect A Long-Standing Agency Position, And Is Inconsistent With Earlier Pronouncements, And Even One Subsequent Pronouncement, Of The Agency. Accordingly, Substantial Deference To The Service's Expertise Is Unwarranted In The Instant Case.*

The Supreme Court's discussion in the 1944 case of *Skidmore v. Swift & Co.,* 323 U.S. 134, 65 S.Ct. 161, 89 L.Ed. 124, continues to provide courts with the guideposts

for analysis of the degree of deference appropriately accorded to interpretative rulings such as the revenue ruling at issue here. See *General Electric Co. v. Gilbert,* 429 U.S. 125, 97 S.Ct. 401, 50 L.Ed.2d 343 (1976). The *Skidmore* court said:

We consider that the rulings, interpretations and opinions of the Administrator under this Act, while not controlling upon the courts by reason of their authority, do constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance. The weight of such a judgment in a particular case will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control.

323 U.S. at 140, 65 S.Ct. at 164. In addition to these factors, courts have generally considered (1) whether the agency's decision was contemporaneous with, or followed soon after, the statute's enactment, *see, e. g., Bingler v. Johnson,* 394 U.S. 741, 749–50, 89 S.Ct. 1439, 22 L.Ed.2d 695 (1969), and (2) whether the agency's interpretation is one of long standing, *see, e. g., NLRB v. Bell Aerospace Co.,* 416 U.S. 267, 274–75, 94 S.Ct. 1757, 40 L.Ed.2d 134 (1974); *United States v. Hall,* 398 F.2d 383, 387 (8th Cir. 1968). *See also* K. Davis, *supra,* § 5.06.

■ Applying all of these factors to the instant case, it is clear that substantial deference to the Service is unwarranted. The statutory interpretation articulated in Revenue Ruling 77–85 is *not* of long standing and was *not* rendered contemporaneously with or even soon after the enactment of both section 801(g)(1)(B) and section 61; nor was it rendered soon after the Service initially considered the tax status to be accorded plaintiffs' investment annuity contracts. More importantly, Revenue Ruling

77–85 flatly contradicts 12 years of consistent treatment by the IRS and, in addition, it contradicts the position taken in the Service's private ruling of August 29, 1977, which was issued during the pendency of this litigation.[3] Compare *United States v. Consumer Life Insurance Co.,* 430 U.S. 725, 751–52, 97 S.Ct. 1440, 52 L.Ed.2d 4 (1977) (deference to consistent interpretation by state agency).

In the recent case of *General Electric Co. v. Gilbert,* 429 U.S. 125, 97 S.Ct. 401, 50 L.Ed.2d 343 (1976), the Supreme Court considered similar circumstances in assessing the authoritativeness of an EEOC guideline. The *General Electric* Court concluded:

We have declined to follow administrative guidelines in the past when they conflicted with the earlier pronouncements of the agency. *United Housing Foundation, Inc. v. Forman,* 421 U.S. 837, 858–859 n. 25, 95 S.Ct. 2051, 44 L.Ed.2d 621 (1975); *Espinoza v. Farah Mfg. Co.,* [414 U.S. 86, 92–96, 94 S.Ct. 334, 38 L.Ed.2d 287 (1973)]. In short, while we do not wholly discount the weight to be given the 1972 guideline, it does not receive high marks when judged by the standards enunciated in *Skidmore, supra.*

429 U.S. at 143, 97 S.Ct. at 411. Similarly, Revenue Ruling 77–85 fares quite poorly when measured against the above-articulated factors. Accordingly, the Court will not accord substantial deference to the Service's ruling.

C. *Substantial Deference To The Service's Expertise Is Also Unwarranted Because The Service Was Improperly Motivated By Considerations Of Tax Reform When It Issued Revenue Ruling 77–85.*

The Service explains its sudden shift in its treatment of investment annuity contracts as follows:

---

3. Defendants have attempted to explain away the private ruling of August 29, 1977, as the product of numerous "administrative errors." *See* Affidavit of Albert M. Caflisch, Exhibit A to Defendants' Opposition to Plaintiffs' Request for Immediate Judgment (September 15, 1977). While these alleged "administrative errors" may explain *how* a private ruling totally inconsistent with a published revenue ruling came to

be issued, these procedural errors do not vitiate the fact that as recently as August 29, 1977, some of the Service's experts continued to believe that annuity contracts not materially different from plaintiffs' investment annuity contracts should be treated as "contracts with reserves based on a segregated asset account" within the meaning of section 801(g)(1)(B).

[B]ecause the investment annuity appeared to share many characteristics with conventional annuities, and because there was as yet no basis for suspecting the investment annuity's potential for tax shelter abuse, the Internal Revenue Service issued a series of private rulings based on FIAC contracts which provided the same favorable treatment to the assets in investment annuity custodia[l] accounts as with respect to the assets in segregated asset accounts established under conventional annuities. . . . [I]t has only been recently that tax experts, tax financial journalists, and wealthy investors have fully perceived the tax avoidance capability in investment annuities, and . . . it is only recently that investment annuity sales have begun to mushroom. It is because of these developments that, approximately one year ago, defendants began their reconsideration of their earlier private letter ruling policy.

Defendants' Memorandum of June 13, 1977, at 13. Nowhere do defendants even contend that they have discovered "some new source of legislative history in the intervening . . . years." *General Electric Co. v. Gilbert,* 429 U.S. at 143, 97 S.Ct. at 412. Defendants' counsel has argued that the Service for the first time *focused* on the difficult question of ownership during this past year: Until this time, he argues, "the Service had not had any factual predicate upon which to be stimulated to look at [investment annuity contracts] with a sufficiently perceptive view." Transcript of June 17, 1977, at 12. This explanation, however, bears a striking resemblance to that proffered by the Service in *Fribourg Navigation Co. v. Commissioner,* 383 U.S. 272, 86 S.Ct. 862, 15 L.Ed.2d 751 (1966), and the Supreme Court's response to that explanation seems equally appropriate in the instant case:

> The Commissioner's position represents a sudden and unwarranted volteface from a consistent administrative [practice] . . . .. Against this array of authority, the Commissioner contends that he did not "focus" on the issue in

most of these instances. This is hardly a persuasive response to the overwhelmingly consistent display of his position.

383 U.S. at 279–80, 86 S.Ct. at 867.

Defendants' explanation for the reconsidered interpretation propounded by Revenue Ruling 77–85 indicates quite clearly that the Service was motivated in its "reconsideration" to take a narrow view of section 801(g)(1)(B) as applied to investment annuity contracts because the Service felt that such contracts "create the possibility of major tax shelter abuse," Defendants' Memorandum of June 13, 1977, at 40, and because growing numbers of persons were beginning to purchase investment annuity contracts. In fact, defendants go so far as to argue that the Court should consider the "equities" of such potential "tax shelter abuse" in interpreting section 801(g)(1)(B). *Id.* at 40–41.

Defendants' counsel candidly admitted at the last hearing on the merits that Revenue Ruling 77–85 was the result of a "massive reconsideration of policy by the Service." Transcript of October 11, 1977, at 28. While such a reconsideration of policy may indeed be desirable, Congress, not the Internal Revenue Service, is the appropriate body to consider such substantive changes in the tax laws. As the Supreme Court recently said in *United States v. Consumers Life Insurance Co.,* 430 U.S. 725, 750 n.34, 97 S.Ct. 1440, 1453, 52 L.Ed.2d 4 (1977):

> We of course are called upon to apply the statute as it is written. Furthermore, the interpretation for which the Government contends "would have wide ramifications which we are not prepared to visit upon taxpayers, absent congressional guidance in this direction." *Commissioner v. Brown,* 380 U.S. 563, 575, 85 S.Ct. 1162, 14 L.Ed.2d 75 (1965). *If changes are thought necessary, that is Congress' business.*

(Emphasis added.) Accordingly, the Court concludes that the Service was improperly motivated by considerations of tax reform when it issued Revenue Ruling 77–85, and

the Service's decision is not entitled to substantial deference under such circumstances.

D. *The Court Will Grant Plaintiffs Substantially All The Declaratory Relief They Seek But Will Withhold Granting Any Injunctive Relief At This Time.*

 For the reasons stated in subsection A, *supra,* and because, as demonstrated in subsections B and C, *supra,* the Service is not entitled to substantial deference under the circumstances of this case, the Court concludes that Revenue Ruling 77–85 is an erroneous and unreasonable interpretation of sections 801(g)(1)(B) and 61 of the Internal Revenue Code, and it is therefore unlawful and beyond the Service's statutory authority. Under these circumstances, plaintiffs are clearly entitled to, and the Court will grant them, substantially all the declaratory relief they seek. Thus, the Court will declare: (1) that Revenue Ruling 77–85 is erroneous and unreasonable, and is therefore unlawful and beyond the statutory authority of the Internal Revenue Service; (2) that custodial account assets of plaintiff FIAC's investment annuity contracts are, for federal tax purposes, owned by the issuing life insurance company and not the policyholder; and (3) that plaintiff FIAC's investment annuity contracts are "contracts with reserves based on a segregated asset account" within the meaning of 26 U.S.C. § 801(g)(1)(B). The only declaratory relief sought that the Court will not grant are those portions of plaintiffs' prayer for relief that ask the Court to prescribe the particular tax consequences of treating investment annuity contracts as "contracts with reserves based on a segregated asset account" within the meaning of section 801(g)(1)(B).

In addition to declaratory relief, plaintiffs pray the Court to grant appropriate injunctive relief. Specifically, they ask the Court to enjoin the defendants, and their agents, employees, attorneys, and all persons in concert or participation with them, from giving any effect whatsoever to Revenue Ruling 77–85 (except for the contributions permitted therein) and from taking, or directing others to take, any position inconsistent with the declaratory relief sought herein. In addition, they ask the Court to require said persons to make all future determinations with respect to FIAC investment annuity contracts in a manner consistent with the declaratory relief sought herein.

 While this Court undoubtedly has the authority to grant broad injunctive relief against the Internal Revenue Service in an appropriate case, such relief does not appear to be necessary at this time. Rather, the Court prefers to withhold the requested injunctive relief based on its confident assumption that the defendants will proceed appropriately, in good faith, and in a manner fully consistent with the declaratory relief granted herein without the coercion of a court order. *See Dunlop v. Bachowski,* 421 U.S. 560, 577, 95 S.Ct. 1851, 44 L.Ed.2d 377 (1975).

An Order in accordance with the foregoing will be issued of even date herewith.

## ORDER

Upon consideration of the points and authorities submitted by the respective parties, and the entire record herein, and it appearing that there are no material facts in dispute, and it further appearing that, pursuant to the stipulation of the parties, final disposition of the merits herein is appropriate, and for the reasons set forth in the Memorandum Opinion issued of even date herewith, it is, by the Court, this 9th day of November, 1977,

ORDERED, ADJUDGED, AND DECREED, that Revenue Ruling 77–85, issued by the Internal Revenue Service on March 9, 1977, be, and the same hereby is, declared to be erroneous and unreasonable, and it is therefore declared to be unlawful and beyond the statutory authority of the Internal Revenue Service; and it is

FURTHER ORDERED, ADJUDGED, AND DECREED, that the custodial account assets of plaintiff FIAC's investment annuity contracts be, and the same hereby are, declared to be owned by the

issuing life insurance company for federal tax purposes; and it is

FURTHER ORDERED, ADJUDGED, AND DECREED, that plaintiff FIAC's investment annuity contracts be, and the same hereby are, declared to be "contracts with reserves based on a segregated asset account" within the meaning of 26 U.S.C. § 801(g)(1)(B); and it is

FURTHER ORDERED, that the remaining relief sought by plaintiffs be, and the same hereby is, denied, without prejudice.

## SUPPLEMENTAL ORDER

WHEREAS, the Court has entered its Order on November 9, 1977 containing a declaratory judgment with respect to the merits involved herein, and

WHEREAS, the plaintiffs have requested injunctive relief, which was the subject of a hearing before this Court on December 5, 1977, at which time the Court determined to grant that relief in part and to deny other aspects of that relief requested by plaintiffs;

NOW, THEREFORE, it is hereby ORDERED,

(1) In accordance with the provisions of *Rev. Rul. 77–85,* defendants, W. Michael Blumenthal, Jerome A. Kurtz, and their successors, shall not treat as taxable to the policyholder income or gain from assets contributed to custodial accounts created pursuant to investment annuity policies entered into between the plaintiffs and such policyholder on or before March 9, 1977.

(2) Defendants shall not treat income or gain from assets contributed after March 9, 1977 to plaintiffs' investment annuity policy custodial accounts as currently taxable to policyholders; *provided,* that in the event that defendants appeal from the Orders entered in this action and prevail in that appeal, defendants may retroactively assess and collect taxes against these policyholders with respect to income and gain from assets contributed after March 9, 1977 to plaintiffs' investment annuity policy custodial accounts.

(3) The Court hereby retains jurisdiction to enter such further orders and grant such further relief as may be necessary or appropriate.