CHEMICAL SPECIALTIES MANUFAC-
TURERS ASSOCIATION and National
Agricultural Chemicals Association,
Plaintiffs,

Velsicol Chemical Corporation,
Plaintiff-Intervenor,

v.

UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY and Douglas
M. Costle, Defendants.

Civ. A. No. 77–1938.

United States District Court,
District of Columbia.

Feb. 8, 1980.

John D. Conner, Robert L. Ackerly, Kenneth W. Weinstein, Charles A. O'Connor, II, Washington, D. C., for plaintiffs.

Patrick Cafferty, Dept. of Justice, Washington, D. C., for defendants.

## MEMORANDUM OPINION

AUBREY E. ROBINSON, Jr., District Judge.

Before the Court are Cross Motions for Summary Judgment in an action brought by the Chemical Specialties Manufacturers Association, the National Agricultural Chemicals Association, and Velsicol Chemical Corporation against the Environmental Protection Agency and its Administrator, Douglas Costle. Plaintiffs challenge two actions of the EPA interpreting Section 6(a)(2) of the Federal Insecticide, Fungicide, and Rodenticide Act (FIFRA), 7 U.S.C. § 136d(a)(2), alleging that (1) the standards imposed by a 1978 EPA memorandum outlining Defendants' interpretation of § 6(a)(2) exceeds the Agency's authority under that section, (2) the 1978 memorandum imposes an undue burden on FIFRA registrants, (3) a 1975 EPA regulation enacted pursuant to § 6(a)(2) exceeds agency authority and (4) the procedures leading to the publication of the 1978 EPA memorandum and the 1975 regulation violated the Administrative Procedure Act (APA) 5 U.S.C. § 553.

I. The Statutory Scheme

FIFRA was originally enacted in 1947 (P.L. 80–104). In 1972 that act was amended by the Federal Environmental Pesticide Control Act (P.L. 92–516), which completely

restructured the federal regulatory scheme and redefined its thrust. The 1972 amendments changed FIFRA from a labeling law into "a comprehensive regulatory statute that . . . more carefully control[s] the manufacture, distribution and use of pesticides." H.Rep.No. 92–511, 92d Cong., 1st Sess. 4 (1971).

The regulatory scheme adopted by Congress requires a careful balancing of risks and benefits before allowing the use of pesticides. The theory underlying this scheme was described by the Senate Committee on Agriculture and Forestry as follows:

> While appropriate pesticides properly used are essential to man and his environment, many constitute poisons that are too dangerous to be used for any purpose. Others are dangerous unless used extremely carefully, and some may have long lasting adverse effects on the environment. Some may be taken up in the food chain and accumulated in man and other animals. Improperly used they may endanger bees and other useful insects, birds, and other animals and their food supply. Pesticides may cause injury through accidental ingestion, inhalation or deposit on the skin. Pesticides therefore have important environmental effects, both beneficial and deleterious. Their wise control based on a careful balancing of benefits versus risk to determine what is best for man is essential.[1]

Thus, the Senate Committee on Agriculture and Forestry described the general purpose of the bill as "[p]rovid[ing] for the more complete regulation of pesticides in order to provide for the protection of man and his environment and the enhancement of the beauty of the world around him." *Id.*, at 3 U.S.Code Cong. & Admin.News 1972, at p. 3995.

In the 1972 FIFRA amendments Congress created a registration system to carry out the risk-benefit balancing. Under Sections 3(a) and 12(a)(1) of FIFRA, 7 U.S.C. §§ 136a(a) and 136j(a)(1), with certain exceptions no pesticide may be distributed sold, or otherwise placed in commerce unless it has been registered. The procedure and requirements for registration are set forth in Section 3 of FIFRA, 7 U.S.C. § 136a. The procedure involves the filing of an application supported by extensive information on the risks and benefits of using the pesticide. The specific information required to be submitted is set forth in guidelines issued pursuant to Section 3(c)(2) of FIFRA.

After reviewing the information submitted by the applicant, Section 3(c)(5) of the Act provides that the EPA Administrator must register the pesticide for the requested use[2] if he finds that:

> When considered with any restrictions imposed under subsection (d)—
>
> (A) its composition is such as to warrant the proposed claims for it;
>
> (B) its labeling and other material required to be submitted comply with the requirements of this act;
>
> (C) it will perform its intended function without unreasonable adverse effects on the environment; and
>
> (D) when used in accordance with widespread and commonly recognized practice it will not generally cause unreasonable adverse effects on the environment.[3]

The crucial risk-benefit balancing approach is embodied in Section 3(c)(5)(C) and (D) through the phrase "unreasonable adverse effects on the environment." That phrase is defined in Section 2(bb) of FIFRA, 7 U.S.C. 136(bb) as follows:

> The term "unreasonable adverse effects on the environment" means any unreasonable risk to man or the environment, taking into account the economic,

---

1. S.Rep.No. 92–838, 92d Cong., 2d Sess. 4 (1972), U.S.Code Cong. & Admin.News 1972, pp. 3993, 3996.

2. Under Section 3(c)(1)(F) the applicant for registration must request that the pesticide be classified for general use, restricted use, or both.

3. 7 U.S.C. § 136a(c)(5).

social, and environmental costs and benefits of the use of any pesticide.

Under Section 3(c)(5)(C) and (D) the balancing of risks and benefits is done by the Administrator at the time of registration. Thus, the Administrator may register a pesticide only if he determines that it will not cause "unreasonable adverse effects on the environment." When the pesticide is registered the Administrator can impose restrictions on its use and can impose labeling requirements to insure that the pesticide is properly handled and applied.

Congress recognized that the risk-benefit balance initially performed at the time of registration could change upon reevaluation of the existing information or as new information concerning the risks or benefits of a pesticide became available. Consequently, in order to insure that the public would be adequately protected from "unreasonable adverse effects on the environment" discovered after registration, Congress empowered the Administrator to take actions ranging from a change in labeling requirements to the actual cancellation of the registration.

In this regard, the Administrator has four basic post-registration options: (1) the Administrator can require a change in the mandatory labeling to insure that adequate notification of the proper handling and application procedures is given; (2) under Sections 3(d)(2) and 6(b) the Administrator can change "the classification of any use of a pesticide from general use to restricted use" whenever he determines such change is necessary to prevent unreasonable adverse effects on the environment; (3) under Section 6(b) the Administrator may cancel the registration of a pesticide whenever he determines that the pesticide causes unreasonable adverse effects on the environment when used in accordance with widespread and commonly recognized practice; and (4) under Section 6(c) the Administrator may suspend the registration of a pesticide during the time required for cancellation or change in classification of that pesticide if he finds that action is necessary to prevent an imminent hazard.

In order to properly implement the post-registration actions, the Administrator needs to be kept current on information regarding the risks of registered pesticides. Congress recognized the need for post-registration information-gathering tools, and provided them in FIFRA. First, under Section 3(c)(2)(B) the Administrator has the authority to require registrants to generate and submit new data in support of an existing registration. Second, Section 6(a)(2) imposes a duty on registrants to submit to the Administrator certain information they obtain after registration. The registrant's information-reporting responsibility is described in that section as follows:

> Information.—If at any time after the registration of a pesticide the registrant has additional factual information regarding unreasonable adverse effects on the environment of the pesticide, he shall submit such information to the Administrator.

Analysis of § 6(a)(2) must be performed in light of Congressional intent underlying FIFRA and the above mentioned purposes served by the submission of information to the EPA.

II. The 1975 Regulation

In 1975 the EPA issued a regulation allegedly reflecting that agency's understanding of § 6(a)(2). The regulation was essentially a re-publication of § 6(a)(2), although the words "factual" and "unreasonable" were omitted. Plaintiffs contend that the regulation was broader than the statute, and thus exceeded the EPA's authority. The government does not seriously dispute this assertion; the EPA has admitted that "the regulation inadequately expresses the Agency's interpretation of the requirement imposed by FIFRA Section 6(a)(2)," [4] and has represented to Plaintiff and to this Court that no actions for possible violations of the regulation will be prosecuted.

The regulation in question was withdrawn; thus, scrutinizing its validity as to

4. 43 Fed.Reg. 37610.

actions after August 1978 is moot. *North Carolina v. Rice,* 404 U.S. 244, 246, 92 S.Ct. 402, 404, 30 L.Ed.2d 413 (1971). Since enforcement of the regulation as to actions prior to August 1978 is in serious doubt, the Court finds that questions regarding that regulation's validity are not ripe for adjudication. *See Poe v. Ullman,* 367 U.S. 497, 507–509, 81 S.Ct. 1752, 1758–1759, 6 L.Ed.2d 989 (1960). All claims relating to the 1975 regulation must be dismissed.

III. The 1978 Memorandum

Plaintiffs challenge the 1978 memorandum on four grounds, to wit: (1) that it exceeds statutory authority, (2) that it imposes an undue burden on the FIFRA registrants, (3) that it is in fact a regulation, and its enactment therefore violated the public comment requirement contained in Section 4 of the Administrative Procedure Act (APA) 5 U.S.C. § 553, and (4) that the memorandum is invalid because irrelevant considerations were given weight re *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971).

A. *Statutory Authority Under Section 6(a)(2)*

Section 6(a)(2) requires that a pesticide registrant provide the EPA with additional factual information regarding unreasonable adverse effects of a pesticide on the environment. Plaintiffs contend that (1) the determination of whether effects are unreasonably adverse rests with the registrant, not with the EPA, and (2) for a pesticide to have an unreasonable adverse effect means that it must have a significant negative impact on the environment. Plaintiffs contentions are without merit. FIFRA provides that the initial determinations regarding information and adverse effects are

made by the EPA. It also provides for ongoing analysis by the EPA regarding those effects. The regulatory scheme evolved because the registrants were not evincing sufficient concern for the deleterious environmental effects of pesticide use. The scheme controls pesticide use by providing for EPA rather than corporate judgment regarding the risks and benefits of a given pesticide. It is the quintessence of absurdity to suggest that once the pesticide is registered, the decision-making responsibility shifts to the industry being regulated. Rather, the responsibility to regulate—and thus the judgment to determine what constitutes unreasonable adverse effects—must rest with the EPA.

■ The EPA claims, however, that unreasonable adverse effects means anything involving the risks or benefits of a given pesticide. While it is clear that the statutory language discusses adverse effects in terms of risks and benefits, this language must be scrutinized in light of the purposes underlying § 6(a)(2). The Agency has historically reasoned that the unreasonable adverse effects standard differs depending upon the context to which it is applied.[5] Section 6(a)(2) only applies to information necessary to reevaluate a pesticide's certification; the initial risk/benefit analysis has already been made. Thus, the type of factual information required by § 6(a)(2) is different from the character of data necessary for the initial classification. Since § 6(a)(2) was enacted to provide the EPA with information necessary to judge whether a pesticide should be more stringently regulated, information regarding the benefits of a pesticide does not fall within the parameters of § 6(a)(2).

■ Plaintiff's allege that the information must show significant adverse effects before § 6(a)(2) requires registrants to sub-

---

5. The six different regulatory contexts in which the standard is applied include (1) the determination of whether to approve or deny an application for registration (§§ 3(c)(5), (6)); (2) the determination of whether to issue notice of intent to cancel registration or to hold a hearing (§ 6(b)); (3) the determination of whether finally to cancel registration (§ 6(d)); (4) the

determination of whether to suspend a registration pending the completion of a cancellation proceeding (§ 6(c)); (5) the determination of whether a pesticide should be classified for general or restricted use (§ 3(d)(2)); and (6) the determination of whether a registrant must report additional factual information (§ 6(a)(2)).

mit the information to the EPA. This contention is erroneous. The Agency has already established that the benefits of the pesticide, when used properly, outweigh the risks involved. Only the Agency knows, however, how the risks and benefits were weighed; only the EPA can ascertain what impact information showing even modest negative environmental effects might have on the initial risk/benefit analysis. Thus, additional factual information reflecting any adverse effects on the environment is covered by § 6(a)(2).

### B. Burden to the Registrant

Section 6(a)(2) requires that "additional factual information" be given to the EPA by the registrant, if the information is in the registrant's possession. Plaintiff's allege that the memorandum burdens the registrants in two ways, namely (1) it requires them to submit a barrage of information to the EPA, even though this is not required by FIFRA, and (2) because of the EPA's construction of "factual," misleading information must be submitted to the Agency. This information may be passed on to the public should a Freedom of Information Act (FOIA) request be presented to the EPA covering these materials. Plaintiffs contend that publication of inadequate information could cause substantial and unwarranted damage to a product's good will and reputation. The sole issue underlying Plaintiffs' contention, however, is the scope of information required by FIFRA. If FIFRA requires information that may damage the reputation of a product, Plaintiffs must go to Congress and amend § 6(a)(2). If FIFRA does not require such information, Plaintiffs need not submit it to the EPA, and no damage to the product's reputation would ensue.

■ Plaintiffs assert that the determination of whether information is factual rests with the registrant, not the EPA. This assertion is meritless. FIFRA does not envision corporate discretion regarding pesticide regulation, and does not provide the registrant with a stranglehold on information. The EPA is empowered to weigh the

risks and benefits of a pesticide; a necessary adjunct to that power is the ability to ascertain the relevance of specific information. This judgment must lie with the regulating agency, not the regulated industry.

■ Plaintiff contends that "factual" information means information that is proven to be accurate and reliable. This construction would twist the meaning of "factual" so as to render § 6(a)(2) functionally useless, because the registrant would then have the discretion to ascertain what information was accurate or reliable. Rather, the registrant must submit all new data showing a pesticide's adverse effects on the environment, along with all the qualifications tending to challenge the veracity of the study in question. While the EPA's memorandum suggests that expert opinion is included in § 6(a)(2), it is mistaken. If Congress had intended to give § 6(a)(2) such broad scope, it would not have limited the information required to facts.

### C. Section 4 of the APA

■ It is undisputed that the EPA declined to follow the APA notice and comment guidelines. The EPA asserts, however, that the memorandum is an interpretative rule, and is thus exempt from the requirements by Section 4(b)(A) of the APA. The Court is convinced that the Agency's claim is dispositive.

The 1978 memorandum is a classic example of an interpretative rule which is exempted from notice and comment procedures by Section 4(b)(A) of the APA. The general rule distinguishing an interpretative rule from a substantive rule was recently reiterated by the District of Columbia Circuit in *Eastern Kentucky Welfare Rights Organization v. Simon*, 165 U.S. App.D.C. 239, 251, 506 F.2d 1278, 1290 (D.C. Cir. 1974) *reversed on other grounds*, 426 U.S. 26, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976):

Generally speaking, it seems to be established that "regulations", "substantive rules" or "legislative rules" are those which create law, usually implementary to an existing law; whereas interpreta-

tive rules are statements as to what the administrative officer thinks the statute or regulation means. . . . "A substantive rule is one which . . . is intended to implement the statutory structure or the statutory powers of an agency. An interpretative rule is one which does not have the full force and effect of a substantive rule but which is in the form of an explanation of particular terms in an Act. If you had an expression in a statute such as 'Interurban Railway,' the query might come up as to what is an 'interurban railway.' A particular agency may adopt a rule defining an interurban railway. That, in a sense, may be called an interpretative rule." [Quoting *Gibson Wine Co. v. Snyder,* 90 U.S.App.D.C. 135, 137–38, 194 F.2d 329, 331–32 (D.C.Cir. 1952).]

Indeed, this Court recently enunciated a similar test in *Hou Ching Chow v. Attorney General,* 362 F.Supp. 1288, 1292 (D.D.C. 1973):

While there is a meaningful distinction between interpretative and substantive rules, the Court is not bound by the "label" attached by the administrative agency. The Court must look to such factors as the real effect of the rule, the source authority for its promulgation, and the force and effect which attach to the rule itself.

Under these tests, the 1978 memorandum is clearly an interpretative rule. The very nature of the memorandum demonstrates that it is nothing more than EPA's interpretation of the reporting requirements of Section 6(a)(2) and adds no new requirements to those stated in that Section. The Administrator's statement accompanying the memorandum in the *Federal Register* specifically recites that the memorandum "sets forth the Environmental Protection Agency's interpretation of the reporting requirements imposed on registrants of pesticides by Section 6(a)(2)" and that the memorandum "is hereby adopted as the Agency's position." 43 Fed.Reg. at 37611. More importantly, the memorandum itself contains a statement that its purpose is to set "forth in detail this Office's [General Counsel]

views concerning the proper interpretation of the registrant reporting requirements imposed by Section 6(a)(2)." *Id.* In addition, EPA also states that "publication of the memorandum would not by itself impose any new or additional requirements, but would constitute a statement of the Agency's position with respect to [the interpretation of Section 6(a)(2)]." *Id.* The memorandum is simply EPA's "explanation" of the Section 6(a)(2) reporting requirements and consequently is an interpretative rule. *Eastern Kentucky Welfare Rights Organization, supra,* 165 U.S.App. D.C. at 251, 506 F.2d at 1290.

Furthermore, the memorandum has no independent legal effect. Indeed, the EPA expressly disavowed any intention to impose "any new or additional requirements" to those contained in Section 6(a)(2). 43 Fed.Reg. 37611. Therefore, the memorandum does not have the full force and effect of a substantive rule and in fact has *no* legal effect. In addition, the memorandum does *not* subject the pesticide industry to any new substantive obligations. *Saint Francis Memorial Hospital v. Weinberger,* 413 F.Supp. 323, 329 (N.D.Cal.1976). Accordingly, it must be concluded that the memorandum is simply an interpretative rule for which notice and comment procedures were not required. *E. g., Eastern Kentucky Welfare Rights Organization, supra,* 165 U.S.App.D.C. at 251, 506 F.2d at 1290, and *Hou Ching Chow, supra,* 362 F.Supp. at 1292.

D. *Considerations Underlying the 1978 Memorandum*

 The 1978 Memorandum is an interpretative statement reflecting the views of the Environmental Protection Agency and in no way creates substantive law, or affects any rights or responsibilities afforded Plaintiffs. To satisfy the standing requirement, Plaintiffs must show (1) a distinct and palpable injury, *Warth v. Seldin,* 422 U.S. 490, 501, 95 S.Ct. 2197, 2206, 45 L.Ed.2d 343 (1975) and (2) a fairly traceable casual connection between the claimed injury and the challenged conducts. *Arlington*

*Heights v. Met. Housing Dev. Corp.*, 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977). Since the Memorandum does not afford Plaintiffs any new rights or responsibilities, it cannot cause them any injury. Plaintiffs thus lack standing to bring this claim.

An appropriate Order follows this Memorandum Opinion.